# GELBARD ET AL. *v.* UNITED STATES

No. 71–110. Argued March 27, 1972—Decided June 26, 1972*

BRENNAN, J., delivered the opinion of the Court, in which DOUGLAS, STEWART, WHITE, and MARSHALL, JJ., joined. DOUGLAS, J., *post,* p. 62, and WHITE, J., *post,* p. 69, filed concurring opinions. REHNQUIST, J., filed a dissenting opinion, in which BURGER, C. J., and BLACKMUN and POWELL, JJ., joined, *post,* p. 71.

*Michael E. Tigar* argued the cause for petitioners in No. 71–110. With him on the brief was *Burton Marks.* *Mr. Marks* filed a brief for petitioner Gelbard in No. 71–110.

*Deputy Solicitor General Friedman* argued the cause for the United States in both cases. On the brief in No. 71–110 were *Solicitor General Griswold, Assistant Attorney General Petersen, Allan A. Tuttle,* and *Beatrice Rosenberg.* On the brief in No. 71–263 were *Solicitor*

*Together with No. 71–263, *United States* v. *Egan et al.,* on certiorari to the United States Court of Appeals for the Third Circuit.

*General Griswold, Assistant Attorney General Mardian, Mr. Tuttle,* and *Robert L. Keuch.*

*Jack J. Levine* argued the cause *pro hac vice* for respondent Egan in No. 71–263. With him on the brief was *Charles R. Nesson. Bernard L. Segal* filed a brief for respondent Walsh in No. 71–263.

*Melvin L. Wulf, Sanford Jay Rosen, Thomas Harvey,* and *Laurence R. Sperber* filed a brief for the American Civil Liberties Union as *amicus curiae* urging reversal in No. 71–110 and affirmance in No. 71–263. *Frank G. Carrington, Jr.,* and *Alan S. Ganz* filed a brief for Americans for Effective Law Enforcement, Inc., as *amicus curiae* urging reversal in No. 71–263.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

These cases present challenges to the validity of adjudications of civil contempt, pursuant to 28 U. S. C. § 1826 (a),[1] of witnesses before federal grand juries

---

[1] Section 1826 (a) provides:

"Whenever a witness in any proceeding before or ancillary to any court or grand jury of the United States refuses without just cause shown to comply with an order of the court to testify or provide other information, including any book, paper, document, record, recording or other material, the court, upon such refusal, or when such refusal is duly brought to its attention, may summarily order his confinement at a suitable place until such time as the witness is willing to give such testimony or provide such information. No period of such confinement shall exceed the life of—

"(1) the court proceeding, or

"(2) the term of the grand jury, including extensions,

"before which such refusal to comply with the court order occurred, but in no event shall such confinement exceed eighteen months."

This provision was enacted as part of the Organized Crime Control Act of 1970. It was intended to codify the existing practice of the federal courts. S. Rep. No. 91–617, pp. 33, 56–57, 148–149 (1969);

who refused to comply with court orders to testify. The refusals were defended upon the ground that interrogation was to be based upon information obtained from the witnesses' communications, allegedly intercepted by federal agents by means of illegal wiretapping and electronic surveillance. A provision of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 82 Stat. 211, as amended, 18 U. S. C. §§ 2510–2520, directs that "[w]henever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any . . . proceeding in or before any . . . grand jury . . . if the disclosure of that information would be in violation of this chapter." 18 U. S. C. § 2515.[2] The question presented is whether grand jury witnesses, in proceedings under 28 U. S. C. § 1826 (a), are entitled to invoke this prohibition of § 2515 as a defense to contempt charges brought against them for refusing to testify. In No. 71–110, the Court of Appeals for the Ninth Circuit held that they are not entitled to do so. *United States* v. *Gelbard,* 443 F. 2d 837 (1971). In No. 71–263, the Court of Appeals for the Third Circuit, *en banc,* reached the contrary conclusion. *In re Grand Jury Proceedings, Harrisburg, Pennsylvania (Egan),* 450

---

H. R. Rep. No. 91–1549, pp. 33, 46 (1970); see *Shillitani* v. *United States,* 384 U. S. 364 (1966).

[2] Section 2515 provides in full:

"Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter."

F. 2d 199 (1971); *In re Grand Jury Proceedings, Harrisburg, Pennsylvania (Walsh)*, 450 F. 2d 231 (1971). We granted certiorari. 404 U. S. 990 (1971).[3] We disagree with the Court of Appeals for the Ninth Circuit and agree with the Court of Appeals for the Third Circuit.

No. 71–110. A federal district judge approved wiretaps by federal agents of the telephones of Perry Paul, an alleged bookmaker, and Jerome Zarowitz, a former executive of a Las Vegas casino. In the course of those taps, the agents overheard conversations between Paul and petitioner Gelbard and between Zarowitz and petitioner Parnas. Petitioners were subsequently called before a federal grand jury convened in Los Angeles to investigate possible violations of federal gambling laws. The Government asserted that petitioners would be questioned about third parties and that the questions would be based upon petitioners' intercepted telephone conversations. Petitioners appeared before the grand jury, but declined to answer any questions based upon their intercepted conversations until they were afforded an opportunity to challenge the legality of the interceptions. Following a hearing, the United States District Court for the Central District of California found petitioners in contempt and, pursuant to 28

---

[3] The Third Circuit followed *Egan* in *In re Grand Jury Investigation (Maratea)*, 444 F. 2d 499 (1971) (*en banc*). The District of Columbia Circuit has aligned itself with the Third, see *In re Evans*, 146 U. S. App. D. C. 310, 452 F. 2d 1239 (1971), while the Ninth has continued to follow *Gelbard*, see *Bacon* v. *United States*, 446 F. 2d 667 (1971); *Olsen* v. *United States*, 446 F. 2d 912 (1971); *In re Russo*, 448 F. 2d 369 (1971); *Reed* v. *United States*, 448 F. 2d 1276 (1971); *United States* v. *Reynolds*, 449 F. 2d 1347 (1971). The First and Fifth Circuits have also adverted to the question. *United States* v. *Doe (In re Marx)*, 451 F. 2d 466 (CA1 1971); *United States* v. *Doe (In re Popkin)*, 460 F. 2d 328 (CA1 1972); *Dudley* v. *United States*, 427 F. 2d 1140 (CA5 1970). See also *United States ex rel. Rosado* v. *Flood*, 394 F. 2d 139 (CA2 1968); *Carter* v. *United States*, 417 F. 2d 384 (CA9 1969).

U. S. C. § 1826 (a), committed them to custody for the life of the grand jury or until they answered the questions.

No. 71–263. Respondents Egan and Walsh were called before a federal grand jury convened in Harrisburg, Pennsylvania, to investigate, among other possible crimes, an alleged plot to kidnap a Government official. Pursuant to 18 U. S. C. § 2514, both respondents were granted transactional immunity in return for their testimony. Respondents appeared before the grand jury, but refused to answer questions on the ground, among others, that the questions were based upon information overheard from respondents by means of the Government's illegal wiretapping and electronic surveillance. The Government did not reply to respondents' allegations.[4] Following a hearing, the United States District Court for the Middle District of Pennsylvania found respondents in contempt, and they were also committed to custody pursuant to 28 U. S. C. § 1826 (a).

Section 1826 (a) expressly limits the adjudication of civil contempt to the case of a grand jury witness who "refuses without just cause shown to comply with an order of the court to testify." Our inquiry, then, is whether a showing that interrogation would be based upon the illegal interception of the witness' communications constitutes a showing of "just cause" that precludes a finding of contempt. The answer turns on the construction of Title III of the Omnibus Crime Control Act.[5]

---

[4] See n. 23, *infra.*

[5] In view of our disposition of these cases, we do not reach any of the constitutional issues tendered as to the right of a grand jury witness to rely upon the Fourth Amendment as a basis for refusing to answer questions. We also note that the constitutionality of Title III is not challenged in these cases.

## I

In Title III, Congress enacted a comprehensive scheme for the regulation of wiretapping and electronic surveillance. See *United States* v. *United States District Court,* 407 U. S. 297, 301–306. Title III authorizes the interception of private wire and oral communications, but only when law enforcement officials are investigating specified serious crimes and receive prior judicial approval, an approval that may not be given except upon compliance with stringent conditions. 18 U. S. C. §§ 2516, 2518 (1)–(8). If a wire or oral communication is intercepted in accordance with the provisions of Title III, the contents of the communication may be disclosed and used under certain circumstances. 18 U. S. C. § 2517. Except as expressly authorized in Title III, however, all interceptions of wire and oral communications are flatly prohibited. Unauthorized interceptions and the disclosure or use of information obtained through unauthorized interceptions are crimes, 18 U. S. C. § 2511 (1), and the victim of such interception, disclosure, or use is entitled to recover civil damages, 18 U. S. C. § 2520. Title III also bars the use as evidence before official bodies of the contents and fruits of illegal interceptions, 18 U. S. C. § 2515, and provides procedures for moving to suppress such evidence in various proceedings, 18 U. S. C. § 2518 (9)–(10).

The witnesses in these cases were held in contempt for disobeying court orders by refusing to produce evidence—their testimony—before grand juries. Consequently, their primary contention is that § 2515, the evidentiary prohibition of Title III, afforded them a defense to the contempt charges. In addressing that contention, we must assume, in the present posture of

these cases, that the Government has intercepted communications of the witnesses and that the testimony the Government seeks from them would be, within the meaning of § 2515, "evidence derived" from the intercepted communications. We must also assume that the communications were not intercepted in accordance with the specified procedures and thus that the witnesses' potential testimony would be "disclosure" in violation of Title III. See 18 U. S. C. §§ 2511 (1), 2517 (3). In short, we proceed on the premise that § 2515 prohibits the presentation to grand juries of the compelled testimony of these witnesses.

The narrow question, then, is whether under these circumstances the witnesses may invoke the prohibition of § 2515 as a defense to contempt charges brought on the basis of their refusal to obey court orders to testify. We think they may.

The unequivocal language of § 2515 expresses the fundamental policy adopted by Congress on the subject of wiretapping and electronic surveillance. As the congressional findings for Title III make plain, that policy is strictly to limit the employment of those techniques of acquiring information:

> "To safeguard the privacy of innocent persons, the interception of wire or oral communications where none of the parties to the communication has consented to the interception should be allowed only when authorized by a court of competent jurisdiction and should remain under the control and supervision of the authorizing court. Interception of wire and oral communications should further be limited to certain major types of offenses and specific categories of crime with assurances that the interception is justified and that the information

obtained thereby will not be misused." § 801 (d), 82 Stat. 211.[6]

The Senate committee report that accompanied Title III underscores the congressional policy:

"Title III has as its dual purpose (1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized. To assure the privacy of oral and wire communications, title III prohibits all wiretapping and electronic surveillance by persons other than duly authorized law enforcement officers engaged in the investigation or prevention of specified types of serious crimes, and only after authorization of a court order obtained after a showing and finding of probable cause." S. Rep. No. 1097, 90th Cong., 2d Sess., 66 (1968).

Hence, although Title III authorizes invasions of individual privacy under certain circumstances, the protection of privacy was an overriding congressional concern.[7] Indeed, the congressional findings articulate

---

[6] "Paragraph (d) recognizes the responsible part that the judiciary must play in supervising the interception of wire or oral communications in order that the privacy of innocent persons may be protected: . . . the interception or use of wire or oral communications should only be on court order. Because of the importance of privacy, such interceptions should further be limited to major offenses and care must be taken to insure that no misuse is made of any information obtained." S. Rep. No. 1097, 90th Cong., 2d Sess., 89 (1968).

[7] In stating the problem addressed by Congress in Title III, the Senate report noted that "[b]oth proponents and opponents of wiretapping and electronic surveillance agree that the present state of the law in this area is extremely unsatisfactory and that the Congress should act to clarify the resulting confusion." *Id.*, at

clearly the intent to utilize the evidentiary prohibition of § 2515 to enforce the limitations imposed by Title III upon wiretapping and electronic surveillance:

"In order to protect effectively the privacy of wire and oral communications, to protect the integrity of court and administrative proceedings, and to prevent the obstruction of interstate commerce, it is necessary for Congress to define on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized, to prohibit any unauthorized interception of such communications, and *the use of the contents thereof in evidence in courts and administrative proceedings.*" § 801 (b), 82 Stat. 211 (emphasis added).[8]

And the Senate report, like the congressional findings, specifically addressed itself to the enforcement, by means

---

67. The report agreed: "It would be, in short, difficult to devise a body of law from the point of view of privacy or justice more totally unsatisfactory in its consequences." *Id.,* at 69. The report then stressed that Title III would provide the protection for privacy lacking under the prior law:

"The need for comprehensive, fair and effective reform setting uniform standards is obvious. *New protections for privacy must be enacted.* Guidance and supervision must be given to State and Federal law enforcement officers. This can only be accomplished through national legislation. This the subcommittee proposes." *Ibid.* (emphasis added).

[8] "Paragraph (b) recognizes that to protect the privacy of wire and oral communications, to protect the integrity of court and administrative proceeding[s] and to prevent the obstruction of interstate commerce, it is necessary for Congress to define on a uniform basis the circumstances and conditions under which the interception of wire or oral communications may be authorized. It also finds that all unauthorized interception of such communications should be prohibited, as well as *the use of the contents of unauthorized*

of § 2515, of the limitations upon invasions of individual privacy:

> "Virtually all concede that the use of wiretapping or electronic surveillance techniques by private unauthorized hands has little justification where communications are intercepted without the consent of one of the participants. No one quarrels with the proposition that the unauthorized use of these techniques by law enforcement agents should be prohibited. . . . Only by striking at all aspects of the problem can privacy be adequately protected. The prohibition, too, must be enforced with all appropriate sanctions. Criminal penalties have their part to play. But other remedies must be afforded the victim of an unlawful invasion of privacy. Provision must be made for civil recourse for damages. *The perpetrator must be denied the fruits of his unlawful actions in civil and criminal proceedings.* Each of these objectives is sought by the proposed legislation." S. Rep. No. 1097, *supra,* at 69 (emphasis added).

Section 2515 is thus central to the legislative scheme. Its importance as a protection for "the victim of an unlawful invasion of privacy" could not be more clear.[9]

_____

*interceptions as evidence in courts and administrative hearings." Id.,* at 89 (emphasis added).

[9] "Section 2515 of the new chapter imposes an evidentiary sanction to compel compliance with the other prohibitions of the chapter. It provides that intercepted wire or oral communications or evidence derived therefrom may not be received in evidence in any proceeding before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision of a State, where the disclosure of that information would be in violation of this chapter. . . . [I]t is not limited to criminal proceedings. Such a suppression rule is necessary and proper to protect privacy. The provision thus

The purposes of § 2515 and Title III as a whole would be subverted were the plain command of § 2515 ignored when the victim of an illegal interception is called as a witness before a grand jury and asked questions based upon that interception. Moreover, § 2515 serves not only to protect the privacy of communications,[10] but also to ensure that the courts do not become partners to illegal conduct: the evidentiary prohibition was enacted also "to protect the integrity of court and administrative proceedings." Consequently, to order a grand jury witness, on pain of imprisonment, to disclose evidence that § 2515 bars in unequivocal terms is both to thwart the congressional objective of protecting individual privacy by excluding such evidence and to entangle the courts in the illegal acts of Government agents.

In sum, Congress simply cannot be understood to have sanctioned orders to produce evidence excluded from grand jury proceedings by § 2515. Contrary to the Government's assertion that the invasion of privacy is over

forms an integral part of the system of limitations designed to protect privacy. Along with the criminal and civil remedies, it should serve to guarantee that the standards of the new chapter will sharply curtail the unlawful interception of wire and oral communications." *Id.*, at 96 (citations omitted).

[10] Congressional concern with the protection of the privacy of communications is evident also in the specification of what is to be protected. "The proposed legislation is intended to protect the privacy of the communication itself . . . ." *Id.*, at 90. As defined in Title III, " 'contents,' when used with respect to any wire or oral communication, includes any information concerning the identity of the parties to such communication or the existence, substance, purport, or meaning of that communication." 18 U. S. C. § 2510 (8). The definition thus "include[s] all aspects of the communication itself. No aspect, including the identity of the parties, the substance of the communication between them, or the fact of the communication itself, is excluded. The privacy of the communication to be protected is intended to be comprehensive." S. Rep. No. 1097, *supra*, at 91.

and done with, to compel the testimony of these witnesses compounds the statutorily proscribed invasion of their privacy by adding to the injury of the interception the insult of compelled disclosure. And, of course, Title III makes illegal not only unauthorized interceptions, but also the disclosure and use of information obtained through such interceptions. 18 U. S. C. § 2511 (1); see 18 U. S. C. § 2520. Hence, if the prohibition of § 2515 is not available as a defense to the contempt charge, disclosure through compelled testimony makes the witness the victim, once again, of a federal crime. Finally, recognition of § 2515 as a defense "relieves judges of the anomalous duty of finding a person in civil contempt for failing to cooperate with the prosecutor in a course of conduct which, if pursued unchecked, could subject the prosecutor himself to heavy civil and criminal penalties." *In re Grand Jury Proceedings, Harrisburg, Pennsylvania (Egan)*, 450 F. 2d, at 220 (Rosenn, J., concurring). "And for a court, on petition of the executive department, to sentence a witness, who is herself the victim of the illegal wiretapping, to jail for refusal to participate in the exploitation of that crime in violation of the explicit command of Section 2515 is to stand our whole system of criminal justice on its head." *In re Evans,* 146 U. S. App. D. C. 310, 323, 452 F. 2d 1239, 1252 (1971) (Wright, J., concurring).

## II

Our conclusion that § 2515 is an available defense to the contempt charge finds additional support in 18 U. S. C. § 3504, enacted as part of the Organized Crime Control Act of 1970, 84 Stat. 935. Section 3504 is explicit confirmation that Congress intended that grand jury witnesses, in reliance upon the prohibition of § 2515, might refuse to answer questions based upon the illegal interception of their communications.

Section 3504 provides:

> "(a) In any . . . proceeding in or before any . . . grand jury . . . .
>
> "(1) upon a claim by a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act or because it was obtained by the exploitation of an unlawful act, the opponent of the claim shall affirm or deny the occurrence of the alleged unlawful act."

Under § 3504 (a)(2), disclosure of information relating to the claim of inadmissibility is not mandatory if the "unlawful act" took place before June 19, 1968, the effective date of Title III. Under § 3504 (a)(3), there is a five-year limitation upon the consideration of a claim of inadmissibility based upon "the exploitation of an unlawful act" that took place before June 19, 1968. Section 3504 (b), by reference to Title III, defines an "unlawful act" as one involving illegal wiretapping or electronic surveillance.[11]

---

[11] Section 3504 provides in full:

"(a) In any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, or other authority of the United States—

"(1) upon a claim by a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act or because it was obtained by the exploitation of an unlawful act, the opponent of the claim shall affirm or deny the occurrence of the alleged unlawful act;

"(2) disclosure of information for a determination if evidence is inadmissible because it is the primary product of an unlawful act occurring prior to June 19, 1968, or because it was obtained by the exploitation of an unlawful act occurring prior to June 19, 1968, shall not be required unless such information may be relevant to a pending claim of such inadmissibility; and

"(3) no claim shall be considered that evidence of an event is inadmissible on the ground that such evidence was obtained by the exploitation of an unlawful act occurring prior to June 19, 1968, if

54

Section 3504, then, establishes procedures to be followed "upon a claim by a party aggrieved that evidence is inadmissible because" of an illegal interception. And § 3504 tracks § 2515 in its application to grand jury proceedings. Indeed, "[t]he language used in defining the types of proceedings, types of forums, and jurisdictions in which section 3504 is applicable was taken from 18 U. S. C. § 2515." S. Rep. No. 91–617, p. 154 (1969).[12] In the application of § 3504 to "any . . . proceeding in or before any . . . grand jury," "a party aggrieved" can only be a witness, for there is no other "party" to a grand jury proceeding. Moreover, a "claim . . . that evidence is inadmissible" can only be a claim that the witness' potential testimony is inadmissible. Hence, § 3504, by contemplating "a claim by a party aggrieved that evidence is inadmissible because" of an illegal interception, necessarily recognizes that grand jury witnesses may rely upon the prohibition of § 2515 in claiming that the evidence sought from them is inadmissible in the grand jury proceedings. Upon such a claim by a grand jury witness, the Government, as "the opponent of the claim," is required under § 3504 (a)(1) to

such event occurred more than five years after such allegedly unlawful act.

"(b) As used in this section 'unlawful act' means any act [involving] the use of any electronic, mechanical, or other device (as defined in section 2510 (5) of this title) in violation of the Constitution or laws of the United States or any regulation or standard promulgated pursuant thereto."

No question as to the constitutionality of § 3504 is raised in these cases.

[12] "The only exception is that section 350 [4] omits legislative committees." S. Rep. No. 91–617, p. 154 (1969). In addition, the House amended § 3504, as passed by the Senate, so that, unlike § 2515, it "applies only to trials and other proceedings conducted under authority of the United States." H. R. Rep. No. 91–1549, p. 51 (1970).

"affirm or deny the occurrence of the alleged" illegal interception. Section 3504 thus confirms that Congress meant that grand jury witnesses might defend contempt charges by invoking the prohibition of § 2515 against the compelled disclosure of evidence obtained in violation of Title III.

The Government urges, however, that the procedures prescribed in § 3504 are limited in application to claims of inadmissibility based upon illegal interceptions that took place before June 19, 1968, and that § 3504 cannot, therefore, provide support for a construction of § 2515. We disagree. While subsections (a)(2) and (a)(3) apply only when the illegal interception took place before June 19, 1968, it is clear both from the face of § 3504 [13] and from its legislative history that subsection (a)(1), imposing the duty upon "the opponent of the claim" to "affirm or deny the occurrence of the alleged" illegal interception, is not similarly limited.

The omission of the June 19, 1968, date from subsection (a)(1) was not inadvertent. Subsection (a)(1) was not in the original Senate bill, although the bill did contain counterparts of present subsections (a)(2) and (a)(3) without the June 19, 1968, or any other date limitation.[14] See Hearings before the Subcommittee on Criminal Laws and Procedures of the Senate Committee on the Judiciary on S. 30 et al., 91st Cong., 1st Sess., 102–

---

[13] The references to June 19, 1968, appear only in subsections (a)(2) and (a)(3). Subsection (a)(1) does not similarly limit the term "unlawful act" with the phrase "occurring prior to June 19, 1968." See n. 11, *supra*. It is thus plain on the face of § 3504 that Congress did not make the duty imposed by subsection (a)(1) dependent upon the date of the alleged illegal interception.

[14] The Senate passed § 3504 in a form that, so far as is pertinent to the issue before us, differed from the section as finally enacted only in that subsections (a)(2) and (a)(3) in the Senate version were not limited in application to illegal interceptions that took place before June 19, 1968. See S. Rep. No. 91–617, pp. 15, 70 (1969).

105 (1969). Subsection (a)(1) was added at the suggestion of the Department of Justice. At that time the Department followed the practice of searching Government files for information about wiretaps and eavesdropping. The Department advised the Senate Judiciary Committee that while it had been "conduct[ing] such examinations as a matter of policy even in cases where no motion ha[d] been filed . . . defendants should be assured such an examination by a specific requirement of law rather than hav[ing] to rely upon the continued viability of a current policy." *Id.,* at 553. The Senate report on § 3504 explained that "since [subsection (a)(1)] requires a pending claim as a predicate to disclosure, it sets aside the present wasteful practice of the Department of Justice in searching files without a motion from a defendant." S. Rep. No. 91–617, p. 154 (1969).

The reason assigned in the Senate for enacting subsection (a)(1) was thus as applicable to post- as it was to pre-June 19, 1968, interceptions. The same was true of the House. There subsection (a)(1) was supported on the ground that it would be beneficial to the victims of illegal interceptions. Senator McClellan, for example, who testified before the House Subcommittee, indicated that subsection (a)(1) "places upon the Government an affirmative duty to answer a claim that evidence is inadmissible because of unlawful investigative conduct." "The first requirement [of § 3504], that the Government admit or deny the occurrence of the alleged invasion of the defendant's rights, actually places or codifies a burden upon the Government, rather than the defendant." Hearings before Subcommittee No. 5 of the House Committee on the Judiciary on S. 30 et al., 91st Cong., 2d Sess., 84, 104 (1970). Other witnesses thought the provision unnecessary.[15] Indeed, one organization submitted

---

[15] "[Subsection (a)(1)] provides that in an attack upon the admissibility of evidence because it is the product of an unlawful

a report that disapproved subsection (a)(1) on the
ground that the Government should admit illegalities
without a prior claim. *Id.*, at 562 (Section of Criminal
Law of the American Bar Association). It is also sig-
nificant that congressional questioning of a representative
of the Department of Justice at the hearings was directed
to the Department's views on the insertion of a date
limitation only in subsections (a)(2) and (a)(3). *Id.*,
at 659; see the Department's written response, *id.*, at
675–676.

The June 19, 1968, date was inserted in subsections
(a)(2) and (a)(3) after the conclusion of the House
hearings. It is apparent from the House report that
only subsections (a)(2) and (a)(3) of the Senate ver-
sion were to be limited by the June 19, 1968, date and
that subsection (a)(1) was to be operative without re-
gard to when the alleged illegal interception may have
taken place:

> "Paragraph (1) provides that upon a claim by
> an aggrieved party that evidence is inadmissible
> because it is the primary product of an unlawful
> act, or because it was obtained by the exploitation
> of an unlawful act, the opponent of the claim
> must affirm or deny the occurrence of the alleged
> unlawful act. Under this provision, upon a charge
> by the defendant with standing to challenge the
> alleged unlawful conduct, the Government would
> be required to affirm or deny that an unlawful act

act . . . , the opponent of such claim shall affirm or deny the
alleged unlawful act . . . . In this respect [§ 3504] is unnecessary."
Hearings before Subcommittee No. 5 of the House Judiciary Com-
mittee on S. 30 et al., 91st Cong., 2d Sess., 399 (1970) (report of
the Committee on Federal Legislation of the New York County
Lawyers' Association). "That is the law now by Supreme Court
decision. [Subsection (a)(1)] adds nothing to what exists right
now." *Id.*, at 513 (testimony of Lawrence Speiser, representing the
American Civil Liberties Union).

involving electronic surveillance had in fact oc-
curred. If such an unlawful act had in fact oc-
curred, paragraph (2), below, will govern disclosure
of the contents of the electronic surveillance rec-
ords or transcripts to the defendant and his counsel,
unless paragraph (3) applies." H. R. Rep. No.
91–1549, p. 51 (1970).

This explanation demonstrates that "the opponent of
the claim" [16] has a duty to "affirm or deny" whenever
"a party aggrieved" "claim[s] . . . that evidence is inad-
missible because it is" derived from an illegal interception.
The date June 19, 1968, becomes relevant only after it is
determined that an illegal interception took place and
an issue thus arises as to disclosure of information bear-
ing on the claim.[17]

---

[16] Congress, of course, was primarily concerned with "certain
evidentiary problems created by electronic surveillance conducted
by the Government prior to the enactment of [Title III] on June 19,
1968, which provided statutory authority for obtaining surveillance
warrants in certain types of criminal investigations (18 U. S. C.
2516)." H. R. Rep. No. 91–1549, p. 50 (1970). As the Senate
report noted, however, § 3504 applies to "[c]ivil as well as criminal
proceedings . . . , regardless of whether a government or govern-
mental body or officer is or is not a party or witness." S. Rep.
No. 91–617, p. 154 (1969). Moreover, "unlawful acts," as defined
in § 3504 (b), may be "acts of private citizens, as well as acts of
Federal or State officials." *Ibid.*

[17] "Under paragraph (2) disclosure of the information shall be
required to be made to a defendant who has demonstrated the
illegality of the electronic surveillance (occurring prior to June 19,
1968) and his standing where such information is or 'may be'
relevant to a claim of inadmissibility. In cases where the electronic
surveillance occurred on or after June 19, 1968, disclosure is man-
datory where illegality and standing are demonstrated. The pro-
vision thus alters the procedure announced in *Alderman* v. *United
States,* 394 U. S. 165 [(1969)] with respect to 'unlawful acts'
committed prior to June 19, 1968." H. R. Rep. No. 91–1549, p. 51
(1970).

## III

The Government argues, finally, that while § 2515 could be construed to allow a grand jury witness to invoke its prohibition as a defense to a contempt charge, "[i]f this section were the only relevant portion of [Title III]," Brief for the United States in No. 71–263, p. 19, proceedings before grand juries are omitted from another provision of Title III, § 2518 (10)(a), that authorizes "[a]ny aggrieved person," [18] in specified types of proceedings, to "move to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom." [19] But it does not follow from the asserted omission of grand jury proceedings from the suppression provision that grand jury witnesses cannot invoke § 2515 as a defense in a contempt proceeding under 28 U. S. C. § 1826 (a).[20] The congressional concern with the appli-

---

[18] An "aggrieved person," for purposes of § 2518 (10) (a), is "a person who was a party to any intercepted wire or oral communication or a person against whom the interception was directed." 18 U. S. C. § 2510 (11); see S. Rep. No. 1097, 90th Cong., 2d Sess., 91, 106 (1968).

[19] Section 2518 (10) provides in pertinent part:

"(a) Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom . . . ."

While on its face § 2518 (10)(a) applies to grand jury proceedings, when compared with the list of proceedings in § 2515, see n. 2, *supra,* it appears that "grand jury" was omitted from the list in § 2518 (10)(a).

[20] "Because no person is a party as such to a grand jury proceeding, the provision does not envision the making of a motion to suppress in the context of such a proceeding itself. . . . It is the intent of the provision only that when a motion to suppress is granted in another context, its scope may include use in a future

cability of § 2518 (10)(a) in grand jury proceedings, so far as it is discernible from the Senate report, was apparently that defendants and potential defendants might be able to utilize suppression motions to impede the issuance of indictments: "Normally, there is no limitation on the character of evidence that may be presented to a grand jury, which is enforcible by an individual. [*United States* v. *Blue*, 384 U. S. 251 (1966).] There is no intent to change this general rule." S. Rep. No. 1097, 90th Cong., 2d Sess., 106 (1968). The "general rule," as illustrated in *Blue*, is that a defendant is not entitled to have his indictment dismissed before trial simply because the Government "acquire[d] incriminating evidence in violation of the [law]," even if the "tainted evidence was presented to the grand jury." 384 U. S., at 255 and n. 3; see *Lawn* v. *United States*, 355 U. S. 339 (1958); *Costello* v. *United States*, 350 U. S. 359 (1956). But that rule has nothing whatever to do with the situation of a grand jury witness who has refused to testify and attempts to defend a subsequent charge of contempt. Hence, we cannot agree that the Senate report expressed the view that a grand jury witness would be foreclosed from raising the § 2515 defense in a contempt proceeding under § 1826 (a).

Furthermore, grand jury witnesses do not normally discover whether they may refuse to answer questions by filing motions to suppress their potential testimony. The usual procedure is, upon the Government's motion, to have a court order a grand jury witness to testify upon penalty of contempt for noncompliance. Section 1826 (a) embodies that traditional procedure. The asserted omission of grand jury proceedings from § 2518

grand jury proceeding." S. Rep. No. 1097, 90th Cong., 2d Sess., 106 (1968). This assertion is not ambiguous, for motions to suppress evidence to be presented to a grand jury would presumably be made in court.

(10)(a) may well reflect congressional acceptance of that procedure as adequate in these cases. Consequently, we cannot suppose that Congress, by providing procedures for suppression motions, intended to deprive grand jury witnesses of the § 2515 defense that would otherwise be available to them. Although the Government points to statements in the Senate report to the effect that § 2518 (10)(a) "limits" § 2515, we read those statements to mean that suppression motions, as a method of enforcing the prohibition of § 2515, must be made in accordance with the restrictions upon forums, procedures, and grounds specified in § 2518 (10)(a).[21]

The judgment of the Court of Appeals for the Ninth Circuit in No. 71–110 is reversed, and the case is remanded for further proceedings consistent with this opinion.[22] The judgment of the Court of Appeals for the Third Circuit in No. 71–263 is affirmed.[23]

*It is so ordered.*

---

[21] "This definition [§ 2510 (11)] defines the class of those who are entitled to invoke the suppression sanction of section 2515 . . . through the motion to suppress provided for by section 2518 (10) (a) . . . ." *Id.*, at 91. "The provision [§ 2515] must, of course, be read in light of section 2518 (10)(a) . . . which defines the class entitled to make a motion to suppress." *Id.*, at 96. "This provision [§ 2518 (10)(a)] must be read in connection with sections 2515 and 2517 . . . which it limits. It provides the remedy for the right created by section 2515." *Id.*, at 106.

[22] Because the District Court and the Court of Appeals erroneously held that grand jury witnesses have no right to invoke a § 2515 defense in contempt proceedings under § 1826 (a), we need not decide whether Gelbard and Parnas may refuse to answer questions if the interceptions of their conversations were pursuant to court order. That is a matter for the District Court to consider in the first instance.

[23] The Court of Appeals vacated the judgments of contempt and remanded for hearings to determine whether the questions asked respondents resulted from the illegal interception of their communications. 450 F. 2d, at 217. Although, in this Court, the

Mr. Justice Douglas, concurring.

Although I join in the opinion of the Court, I believe that, independently of any statutory refuge which Congress may choose to provide, the Fourth Amendment shields a grand jury witness from any question (or any subpoena) which is based upon information garnered from searches which invade his own constitutionally protected privacy.

I would hold that Title III of the Omnibus Crime Control and Safe Streets Act of 1968 offends the Fourth Amendment, as does all wiretapping and bugging, for reasons which I have often expressed elsewhere. *E. g., Cox* v. *United States,* 406 U. S. 934; *Williamson* v. *United States,* 405 U. S. 1026; *Katz* v. *United States,* 389 U. S. 347, 359; *Berger* v. *New York,* 388 U. S. 41, 64; *Osborn* v. *United States,* 385 U. S. 323, 340; *Pugach* v. *Dollinger,* 365 U. S. 458, 459; *On Lee* v. *United States,* 343 U. S. 747, 762. In each of the present cases a grand jury witness seeks to prove and suppress suspected unconstitutional seizures of his own telephone conversations. And, in every relevant respect, the proceedings below were in striking parallel to those in *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385.

In that case, after federal agents unlawfully seized papers belonging to the Silverthornes and to their lumber company, the documents were returned upon order of the court. In the interim, however, the agents had copied them. After returning the seized originals, the prosecutor attempted to regain possession of them by issuing a grand jury subpoena *duces tecum.* When the petitioners refused to comply with the subpoena they

Government now denies that there was any overhearing, in view of our affirmance that is a matter for the District Court to consider in the first instance.

were convicted of contempt. In reversing those judgments, this Court, through Mr. Justice Holmes, held that the Government was barred from reaping any fruit from its forbidden act and wove into our constitutional fabric the celebrated maxim that "[t]he essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all." 251 U. S., at 392.

Petitioners Gelbard and Parnas and respondents Egan and Walsh occupy positions which are virtually identical to that of the Silverthornes and their company. They desire to demonstrate that but for unlawful surveillance of them the grand jury would not now be seeking testimony from them. And, as in *Silverthorne,* they are the victims of the alleged violations, seeking to mend no one's privacy other than their own. Finally, here, as there, the remedy preferred is permission to refuse to render the requested information.

Unless *Silverthorne* is to be overruled and uprooted from those decisions which have followed it, such as *Nardone* v. *United States,* 308 U. S. 338, 340–341; *Benanti* v. *United States,* 355 U. S. 96, 103; *Elkins* v. *United States,* 364 U. S. 206, 210; *Mapp* v. *Ohio,* 367 U. S. 643, 648; *Wong Sun* v. *United States,* 371 U. S. 471, 484–485; *Harrison* v. *United States,* 392 U. S. 219, 222; and *Alderman* v. *United States,* 394 U. S. 165, 171, 177, these witnesses deserve opportunities to prove their allegations and, if successful, to withhold from the Government any further rewards of its "dirty business." *Olmstead* v. *United States,* 277 U. S. 438, 470 (Holmes, J., dissenting).

The Solicitor General does not propose that *Silverthorne* be overruled. Nor does he deny its remarkable similarity. Indeed, his analysis of the constitutional issue at stake here fails even to mention that landmark de-

cision.[1] And none of the precedents cited by him detract from *Silverthorne*'s vitality.[2]

Rather, the Government treats this decision as a "novel

---

[1] At oral argument, counsel for the United States contended that *Silverthorne Lumber Co.* v. *United States*, 251 U. S. 385, was distinguishable. First, it was said that in these cases there has yet been no showing of illegal surveillance. Tr. of Oral Arg. 26. The point is, however, that these witnesses claim to be able to make such a showing, although none of the trial courts below have permitted hearings on the issue. Second, it was also argued that *Silverthorne* was inapposite because there the very papers seized unlawfully were the ones later sought under the court's subpoena. *Ibid.* But there is little doubt that Mr. Justice Holmes' reasoning would also have relieved the Silverthornes from testifying before the grand jury as to the contents of the purloined papers.

[2] Three of the cases cited by the Solicitor General stand for nothing more than the rule that a defendant may not challenge prior to trial the evidence from which the indictment was drawn. *Costello* v. *United States*, 350 U. S. 359; *Lawn* v. *United States*, 355 U. S. 339; *United States* v. *Blue*, 384 U. S. 251. To be sure, the other authorities cited rejected various privileges from testifying but only for reasons which are not in conflict with *Silverthorne Lumber Co.* v. *United States*, *supra*. For example, in *Murphy* v. *Waterfront Comm'n*, 378 U. S. 52; and *Piemonte* v. *United States*, 367 U. S. 556, in light of our dispositions in those cases, no threatened constitutional violation remained as a predicate for a privilege. For in *Murphy* we eliminated the threat that testimony to a state grand jury given in exchange for a state immunity grant could, despite the witness' fears to the contrary, be used against him by other jurisdictions. And in *Piemonte* the Fifth Amendment basis for declining to answer was dissolved by the majority's finding that there had been a proper grant of immunity. True, *Goldstein* v. *United States*, 316 U. S. 114, 121, and *Alderman* v. *United States*, 394 U. S. 165, denied standing to defendants to suppress the fruits of Fourth Amendment injuries to others, but that issue is not presented here inasmuch as all of these movants purported to be victims of intercepted conversations. Finally, *Blair* v. *United States*, 250 U. S. 273, held that a grand jury witness may not withhold evidence solely because he believes that the statutes (which the grand jury suspects may have been violated) are unconstitutional. That contention, of course, has not been tendered by these grand jury witnesses. Moreover, *Blair* itself

extension" of Fourth Amendment protections, leaning heavily upon the observation that the exclusionary rule has never been extended to "provide that illegally seized evidence is inadmissible against anyone for any purpose." *Alderman, supra,* at 175. This aphorism is contravened, concludes the Solicitor General, by any result permitting a nondefendant to "suppress" evidence sought to be introduced at another's trial or to withhold testimony from a grand jury investigation of someone else.

To be sure, no majority of this Court has ever held that "anything which deters illegal searches is thereby commanded by the Fourth Amendment." *Id.,* at 174. But that concern is not at stake here. No one is attempting to assert vicariously the rights of others. Here it is only necessary to adhere to the basic principle that victims of unconstitutional practices are themselves entitled to effective remedies. For, "where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief." *Bell* v. *Hood,* 327 U. S. 678, 684. And see *Bivens* v. *Six Unknown Federal Narcotics Agents,* 403 U. S. 388.

The fact that the movants below sought to *withhold* evidence does not transform these cases into unusual ones. A witness is often permitted to retain exclusive custody of information where a contrary course would jeopardize important liberties such as First Amendment guarantees, *Watkins* v. *United States,* 354 U. S. 178; *NAACP* v. *Alabama,* 357 U. S. 449, 463; *Gibson* v. *Florida Legislative Investigation Committee,* 372 U. S. 539; *Baird* v. *State Bar of Arizona,* 401 U. S. 1, 6–7; *In re Stolar,* 401

recognizes that "for special reasons a witness may be excused from telling all that he knows." *Id.,* at 281. "Special reasons" presumably was meant to include Fourth Amendment grounds, as was permitted shortly thereafter in *Silverthorne.*

U. S. 23; Fifth Amendment privileges, *Hoffman* v. *United States,* 341 U. S. 479, or traditional testimonial privileges.[3]

The same is true of Fourth Amendment authority to withhold evidence, even from a grand jury. *Hale* v. *Henkel,* 201 U. S. 43; *Silverthorne, supra.* No one would doubt, for example, that under *Bell* v. *Hood, supra,* and *Bivens, supra* (or *Monroe* v. *Pape,* 365 U. S. 167, where state police were concerned), a telephone subscriber could obtain an injunction against unlawful wiretapping of his telephone despite the fact that such termination might remove from the Government's reach evidence with which it could convict third parties.

A contrary judgment today would cripple enforcement of the Fourth Amendment. For, if these movants, who the Solicitor General concedes are not the prosecutors' targets, were required to submit to interrogation, then they (unlike prospective defendants) would have no further opportunity to vindicate their injuries. More generally, because surveillances are often "directed primarily to the collecting and maintaining of intelligence with respect to subversive forces, and are not an attempt to gather evidence for specific criminal prosecutions," *United States* v. *United States District Court,* 407 U. S. 297, 318–319, the normal exclusionary threat of *Weeks* v. *United States,* 232 U. S. 383, would be sharply attenuated and intelligence centers would be loosed from virtually every deterrent against abuse.[4] Furthermore, even

---

[3] *E. g., Alexander* v. *United States,* 138 U. S. 353 (lawyer-client); *Blau* v. *United States,* 340 U. S. 332 (marital); *United States* v. *Reynolds,* 345 U. S. 1 (military aircraft specifications).

[4] Our remark in *United States* v. *United States District Court,* 407 U. S. 297, 318–319, was our understanding only of the motivation behind federal national security wiretapping. But the statistical evidence shows that nonsecurity wiretapping also is seldom used to convict criminals. In 1969, court-ordered federal wiretapping seized 44,940 conversations but only 26 convictions were obtained. In 1970,

where the "uninvited ear" is used to obtain criminal convictions, rather than for domestic spying, a rule different from our result today would supply police with an added incentive to record the conversations of suspected co-conspirators in order to marshal evidence against alleged ringleaders. We are told that "[p]olice are often tempted to make illegal searches during the investigations of a large conspiracy. Once the police have established that several individuals are involved, they may deem it worthwhile to violate the constitutional rights of one member of the conspiracy (particularly a minor member) in order to obtain evidence for use against others." White & Greenspan, Standing to Object to Search and Seizure, 118 U. Pa. L. Rev. 333, 351 (1970) (footnotes omitted). Because defendants are normally denied "standing" to suppress evidence procured as a result of invasions of others' privacy, today's remedy is necessary to help neutralize the prosecutorial reward of such tactics.

Today's remedy assumes an added and critical measure of importance for, due to the clandestine nature of electronic eavesdropping, other inhibitions on officers' abuse, such as the threat of damage actions, reform through the political process, and adverse publicity, will be of little avail in guarding privacy.

Moreover, when a court assists the Government in extracting fruits from the victims of its lawless searches it degrades the integrity of the judicial system. For "[n]othing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence." *Mapp* v. *Ohio,* 367 U. S. 643, 659. For this reason, our decisions have em-

---

federal court orders permitted the seizure of 147,780 communications, with 48 convictions. H. Schwartz, A Report on the Costs and Benefits of Electronic Surveillance ii–v (1971).

braced the view that "[t]he tendency of those who execute the criminal laws of the country to obtain conviction by means of unlawful seizures and enforced confessions . . . should find no sanction in the judgments of the courts, which are charged at all times with support of the Constitution." *Weeks* v. *United States,* 232 U. S. 383, 392. As mentioned earlier, this principle was at the heart of the *Silverthorne* decision. Later in his dissent in *Olmstead* v. *United States,* 277 U. S., at 470, a case in which federal wiretappers had violated an Oregon law, Mr. Justice Holmes, citing *Silverthorne,* thought that both the officers and the court were honor bound to observe the state law: "If the existing code does not permit district attorneys to have a hand in such dirty business it does not permit the judge to allow such iniquities to succeed." In the same case, Justice Brandeis, who was then alone in his view that wiretapping was a search within the meaning of the Fourth Amendment, phrased it this way: "In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy." *Id.,* at 485.

In an entrapment case, Mr. Justice Frankfurter, with whom Justices Harlan, BRENNAN, and I joined, thought that "the federal courts have an obligation to set their face against enforcement of the law by lawless means" because "[p]ublic confidence in the fair and honorable administration of justice, upon which ultimately depends the rule of law; is the transcending value at stake." *Sherman* v. *United States,* 356 U. S. 369, 380 (concurring in result); see also his opinion for the Court in *Nardone* v. *United States,* 308 U. S. 338, 340–341. In a Self-

Incrimination Clause decision, MR. JUSTICE BRENNAN (joined by MR. JUSTICE MARSHALL and myself) used fewer words: "it is monstrous that courts should aid or abet the lawbreaking police officer." *Harris* v. *New York,* 401 U. S. 222, 232 (dissenting opinion).

These standards are at war with the Government's claim that intelligence agencies may invoke the aid of the courts in order to compound their neglect of constitutional values. To be sure, at some point taint may become so attenuated that ignoring the original blunder will not breed contempt for law. But here judges are not asked merely to overlook infractions diminished by time and independent events. Rather, if these witnesses' allegations are correct, judges are being invited to become the handmaidens of intentional[5] police lawlessness by ordering these victims to elaborate on their telephonic communications of which the prosecutors would have no knowledge but for their unconstitutional surveillance.

In summary, I believe that *Silverthorne* was rightly decided, that it was rooted in our continuing policy to equip victims of unconstitutional searches with effective means of redress, that it has enjoyed repeated praise in subsequent decisions, that it has not been seriously challenged here, and that it requires that we affirm the Third Circuit in *Egan* and *Walsh* and reverse the Ninth Circuit in *Gelbard* and *Parnas.*

MR. JUSTICE WHITE, concurring.

Under 28 U. S. C. § 1826 (a) a witness who refuses to testify "without just cause" may be held in contempt of court. Here, grand jury witnesses are involved, and the just cause claimed to excuse them is that the testimony demanded involves the disclosure and use of communica-

---

[5] As Mr. Justice Fortas said, wiretapping "is usually the product of calculated, official decision rather than the error of an individual agent of the state." *Alderman* v. *United States,* 394 U. S., at 203.

tions allegedly intercepted in violation of the controlling federal statute and hence inadmissible under 18 U. S. C. § 2515.

The United States asserts that § 2515 affords no excuse to grand jury witnesses under any circumstances. Reliance is placed on § 2518 (10)(a) and the legislative history of the statute. I agree with the Court, however, that at least where the United States has intercepted communications without a warrant in circumstances where court approval was required, it is appropriate in construing and applying 28 U. S. C. § 1826 not to require the grand jury witness to answer and hence further the plain policy of the wiretap statute. This unquestionably works a change in the law with respect to the rights of grand jury witnesses, but it is a change rooted in a complex statute, the meaning of which is not immediately obvious as the opinions filed today so tellingly demonstrate.

Where the Government produces a court order for the interception, however, and the witness nevertheless demands a full-blown suppression hearing to determine the legality of the order, there may be room for striking a different accommodation between the due functioning of the grand jury system and the federal wiretap statute. Suppression hearings in these circumstances would result in protracted interruption of grand jury proceedings. At the same time, prosecutors and other officers who have been granted and relied on a court order for the interception would be subject to no liability under the statute, whether the order is valid or not; and, in any event, the deterrent value of excluding the evidence will be marginal at best. It is well, therefore, that the Court has left this issue open for consideration by the District Court on remand. See *ante,* at 61 n. 22.

Of course, where the Government officially denies the fact of electronic surveillance of the witness, the matter is at an end and the witness must answer.

MR. JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE, MR. JUSTICE BLACKMUN, and MR. JUSTICE POWELL join, dissenting.

Disposition of these cases depends on the sorting out of admittedly conflicting implications from different sections of the principal statute involved. The Court's conclusion, while supportable if regard be had only for the actual language of the sections, is by no means compelled by that language. Its conclusion is reached in utter disregard of the relevant legislative history, and quite without consideration of the sharp break that it represents with the historical *modus operandi* of the grand jury. It is, in my opinion, wrong.

The Court states the question to be whether witnesses threatened with contempt under 28 U. S. C. § 1826 (a) "are entitled to invoke this prohibition of § 2515 as a defense to contempt charges brought against them for refusing to testify." *Ante,* at 43. The question as thus framed by the Court has been so abstracted and refined, and divorced from the particulars of these two cases, as to virtually invite the erroneous answer that the opinion of the Court gives.

Nor is it accurate to "assume," as the Court does, that the Government's overhearing of these witnesses was in violation of the applicable statute. Petitioner Gelbard contended in the trial court that the United States planned to use his electronically overheard conversations as one basis for questioning him before the grand jury, and so stated in a presentation to that court. The Government in a reply affidavit stated that whatever information had been gathered as a result of electronic overhearing had been obtained from wiretaps conducted

pursuant to court order as provided in 18 U. S. C. § 2518.[1] Parnas, so far as this record shows, made no similar allegation in the trial court. The Court of Appeals in its opinion described the position taken by these witnesses in the following language:

> "When cited for contempt in the district court, each attacked the constitutional validity of Section 2518, and additionally urged that he should not be required to testify until and unless first allowed to inspect all applications, orders, tapes and transcripts relating to such electronic surveillance and afforded an opportunity to suppress the use before the grand jury of any evidence so secured . . . ." 443 F. 2d 837, 838.

Thus what was presented to the trial court in this proceeding under 18 U. S. C. § 1826 (a) was not a neatly stipulated question of law, but a demand by the petitioners that they be permitted to roam at will among the prosecutor's records in order to see whether they might be able to turn up any evidence indicating that the Government's overhearing of their conversations had been unauthorized by statute. In order to determine whether this particular type of remedy is open to these petitioners at this particular stage of potential criminal proceedings it is not enough to recite, as the Court does, that 18 U. S. C. § 2515 prohibits the use of illegally overheard wire communications before grand juries as well as before other governmental bodies. This

---

[1] In the case of respondents Egan and Walsh, the Government in the District Court did not state whether it had engaged in electronic surveillance. In this Court, however, the Government represented that respondents Egan and Walsh had not been subjected to electronic surveillance. In light of this development, I would remand their case to the District Court in order to give the respondents another opportunity to testify. For this reason, references to "petitioners" throughout this opinion are meant to be to only petitioners Gelbard and Parnas.

proposition is not disputed. The far more difficult inquiry posed by these facts is whether the granting to these petitioners, at this particular stage of these proceedings, of sweeping discovery as a prelude to a full hearing on the issue of alleged unlawful surveillance can fairly be inferred from the enactment by Congress of the two statutes relied on in the Court's opinion.

## I

It may be helpful at the outset to treat briefly the background of 28 U. S. C. § 1826 (a). As the Court notes, this provision was enacted as a part of the Organized Crime Control Act of 1970, and the Senate Report states that it was intended to codify the "present practice" of the federal courts. S. Rep. No. 91–617, p. 148 (1969). The existing practice of the federal courts prior to the enactment of this section was based on Fed. Rule Crim. Proc. 42 and on 18 U. S. C. § 401, both of which dealt generally with the power of courts to punish for contempt. The enactment of § 1826 (a) appears to have resulted from a desire on the part of Congress to treat separately from the general contempt power of courts their authority to deal with recalcitrant witnesses in court or grand jury proceedings. Since, as the Senate Report states, the enactment of this provision was designed to "codify present practice" it is instructive to note the types of claims litigated in connection with grand jury matters under Rule 42 and 18 U. S. C. § 401 prior to the enactment of this new section. So far as the reported decisions of this Court and of the lower federal courts reveal, prior litigation with respect to grand juries has dealt almost exclusively with questions of privilege, and most of these cases have dealt with issues of the privilege against self-incrimination. While it is plain that the respondent in such proceedings was entitled to a hearing and to adduce evidence, it is equally plain that the

typical hearing was short in duration and largely devoted to the arguments of counsel on an agreed statement of facts.[2]

Some of the flavor of the type of proceeding contemplated under the prior practice is gleaned from the following passage in the Court's opinion in *Shillitani* v. *United States,* 384 U. S. 364, 370 (1966) (citations omitted):

> "There can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt . . . . And it is essential that courts be able to compel the appearance and testimony of witnesses . . . . A grand jury subpoena must command the same respect . . . . Where contempt consists of a refusal to obey a court order to testify at any stage in judicial proceedings, the witness may be confined until compliance . . . ."

These proceedings seem almost invariably to have been short and summary in nature, not because the defendant was to be denied a fair hearing, but because the type of issue that could be raised at such a proceeding was one which did not generally permit extensive factual development. Even where a court of appeals reversed a contempt adjudication because of the district court's failure to allow the defendant to testify on his own behalf with respect to material issues, there was no hint of either the right to, or the necessity for, any discovery proceedings against the Government. *Hooley* v. *United States,* 209 F. 2d 219 (CA1 1954).

Congress was, of course, free to expand the scope of inquiry in these proceedings, to enlarge the issues to

---

[2] See, *e. g., Blau* v. *United States,* 340 U. S. 159 (1950); *Rogers* v. *United States,* 340 U. S. 367 (1951); *Curcio* v. *United States,* 354 U. S. 118 (1957); *United States* v. *George,* 444 F. 2d 310 (CA6 1971); *In re October 1969 Grand Jury,* 435 F. 2d 350 (CA7 1970).

be tried, and to alter past practice in any other way that it chose consistently with the Constitution. But in view of the stated congressional intent to "codify present practice" by the enactment of § 1826 (a), we should require rather strong evidence of congressional purpose to conclude that Congress intended to engraft on the traditional and rather summary contempt hearings a new type of hearing in which a grand jury witness is accorded *carte blanche* discovery of all of the Government's "applications, orders, tapes, and transcripts relating to such electronic surveillance" before he may be required to testify. 443 F. 2d, at 838.

## II

Just as Congress was not writing on a clean slate in the area of contempt hearings, it was not writing on a clean slate with respect to the nature of grand jury proceedings. These petitioners were called before a grand jury that had been convened to investigate violations of federal laws. We deal, therefore, not with the rights of a criminal defendant in the traditional adversary context of a trial, but with the status of witnesses summoned to testify before a body devoted to sifting evidence that could result in the presentment of criminal charges. Just as the cases arising under the antecedents of 28 U. S. C. § 1826 (a) suggest a limitation on the type of issue which may be litigated in such a proceeding, cases dealing with the role of the grand jury stress the unique breadth of its scope of inquiry. In *Blair* v. *United States,* 250 U. S. 273, 282 (1919), this Court defined the vital investigatory function of the grand jury:

> "It is a grand inquest, a body with powers of investigation and inquisition, the scope of whose inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result of

the investigation, or by doubts whether any particular individual will be found properly subject to an accusation of crime. As has been said before, the identity of the offender, and the precise nature of the offense, if there be one, normally are developed at the conclusion of the grand jury's labors, not at the beginning. . . ."

Another passage from *Blair* pointed out the citizen's obligation to obey the process of the grand jury:

"[I]t is clearly recognized that the giving of testimony and the attendance upon court or grand jury in order to testify are public duties which every person within the jurisdiction of the Government is bound to perform upon being properly summoned." *Id.,* at 281.

In *Costello* v. *United States,* 350 U. S. 359, 362 (1956), the Court traced the development of the English grand jury and concluded that the probable intent of the Framers of our Constitution was to parallel that institution as it had existed in England where "[g]rand jurors were selected from the body of the people and their work was not hampered by rigid procedural or evidential rules." 350 U. S., at 362. The Court in *Costello* was at pains to point out the necessity of limiting the nature of challenges to evidence adduced before a grand jury if that body were to retain its traditional comprehensive investigative authority:

"If indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed. The result of such a rule would be that before trial on the merits a defendant could always insist on the kind of preliminary trial to determine the competency and

adequacy of the evidence before the grand jury." 350 U. S., at 363.

While this general statement applied by its terms only to one who was ultimately indicted by the grand jury, its reasoning applies with like force to one who seeks to make an evidentiary challenge to grand jury proceedings on the basis of his status as a prospective witness. Indeed, time-consuming challenges by witnesses during the course of a grand jury investigation would be far more inimical to the function of that body than would a motion to dismiss an indictment after it had concluded its deliberations.

In *Lawn* v. *United States,* 355 U. S. 339 (1958), the Court refused to accord to petitioners the hearing, prior to trial, on the issue of whether or not a grand jury which indicted them had made direct or derivative use of materials the use of which by an earlier grand jury had been held to violate the petitioners' privilege against self-incrimination. In supporting its conclusion that the petitioners should not even be accorded a hearing to sustain these contentions, the Court quoted a passage from *Costello* describing the grand jury as

"'[an] institution, in which laymen conduct their inquiries unfettered by technical rules. Neither justice nor the concept of a fair trial requires such a change. In a trial on the merits, defendants are entitled to a strict observance of all the rules designed to bring about a fair verdict. Defendants are not entitled, however, to a rule which would result in interminable delay but add nothing to the assurance of a fair trial.'" 355 U. S., at 350.

It seems to me to be clear beyond cavil from these cases that prior to the enactment of the Omnibus Crime Control and Safe Streets Act of 1968, a hearing such as

that which the Court awards these petitioners was not only unauthorized by law, but completely contrary to the ingrained principles which have long governed the functioning of the grand jury.

## III

When Congress set out to enact the two statutes on which the Court relies, it was certainly not with any announced intent to change the nature of contempt hearings relating to grand jury proceedings, or to change the *modus operandi* of the grand jury. Instead, largely in response to the decisions of this Court in *Berger* v. *New York,* 388 U. S. 41 (1967), and *Katz* v. *United States,* 389 U. S. 347 (1967), Congress undertook to draft comprehensive legislation both authorizing the use of evidence obtained by electronic surveillance on specified conditions, and prohibiting its use otherwise. S. Rep. No. 1097, 90th Cong., 2d Sess., 66 (1968). The ultimate result was the 1968 Act. Critical to analysis of the issue involved here are §§ 2515 and 2518 (10)(a) of that Act, which provide in pertinent part as follows:

> "Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority . . . if the disclosure of that information would be in violation of this chapter." § 2515.

> "Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any

intercepted wire or oral communication, or evidence derived therefrom, on the grounds that—

"(i) the communication was unlawfully intercepted;

"(ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or

"(iii) the interception was not made in conformity with the order of authorization or approval. . . ." § 2518 (10)(a).

Here is presented at the very least an implied conflict between two separate sections of the same Act. Section 2515 proscribes generally the use of unlawfully intercepted communications as evidence before a number of specified bodies, including a grand jury. Section 2518 (10)(a) provides for the type of hearing that petitioners sought and were denied by the District Court; it provides such hearings in connection with a number of specified legal proceedings, but it conspicuously omits proceedings before a grand jury. The method by which the Court solves this dilemma is to state that if petitioners succeed after their discovery in establishing their claim of unlawful electronic surveillance, their questioning before the grand jury on the basis of such electronic surveillance would violate § 2515 as, of course, it presumptively would. Therefore, says the Court, petitioners *must* be entitled to the discovery and factual hearing which they seek, even though § 2518 (10)(a) rather clearly denies it to them by implication.

A construction which I believe at least equally plausible, based simply on the juxtaposition of the various sections of the statute, is that § 2515 contains a basic proscription of certain conduct, but does not attempt to specify remedies or rights arising from a breach of that proscription; the specification of remedies is left

to other sections. Other sections provide several remedies; criminal and civil sanctions are imposed by §§ 2511 and 2520, whereas § 2518 (10)(a) accords a right to a suppression hearing in specified cases. Thus the fact that one who may be the victim of alleged unlawful surveillance on the part of the Government is not accorded an *Alderman*-type suppression hearing (*Alderman* v. *United States,* 394 U. S. 165 (1969)) under the provisions of § 2518 (10)(a) is not left remediless to such a degree that it must be presumed to have been an oversight; he is remitted to the institution of civil proceedings, or the filing of a complaint leading to the institution of a criminal prosecution. While the latter two remedies may not be as efficacious in many situations as a suppression hearing, the remission of an aggrieved party to those remedies certainly does not render nugatory the general proscription contained in § 2515.

The omission of "grand jury" from the designated forums in § 2518 (10)(a) is not explainable on the basis that though the testimony is sought to be adduced before a grand jury, the motion to suppress would actually be made in a court, which is one of the forums designated in § 2518 (10)(a). The language "in any trial, hearing, or proceeding in or before" quite clearly refers to the forum in which the testimony is sought to be adduced. But even more significant is the inclusion among the designated forums of "department," "officer," "agency," and "regulatory body." Congress has almost without exception provided that issues as to the legality and propriety of subpoenas issued by either agencies or executive departments should be resolved by the courts. It has accomplished this result by requiring the agency to bring an independent judicial action to enforce obedience to its subpoena. See, *e. g.,* 15 U. S. C. § 79r, Public Utility Holding Company Act of 1935; 15 U. S. C. § 78u, Securities Exchange Act of 1934; 41 U. S. C. §§ 35–45, Walsh-

Healey Act; 50 U. S. C. App. § 2155, Defense Production Act of 1950; 47 U. S. C. §§ 409 (f) and (g), Communications Act of 1934; 46 U. S. C. § 1124, Merchant Marine Act, 1936; 26 U. S. C. § 7604, Internal Revenue Code of 1954; 16 U. S. C. § 825f (c), Electric Utility Companies Act; 15 U. S. C. § 717m (d), Natural Gas Act; 7 U. S. C. § 511n, Tobacco Inspection Act. This general mode of enforcement of agency investigative subpoenas was discussed in the context of the Fair Labor Standards Act in *Oklahoma Press Publishing Co.* v. *Walling,* 327 U. S. 186 (1946).

Thus, if Congress in § 2518 had intended to focus on the forum in which the hearing as to the legality of the subpoena is to be determined, rather than the forum in which the testimony is sought to be adduced, it would have omitted not only grand juries, but departments, officers, agencies, and regulatory bodies as well from the coverage of § 2518 (10)(a). For questions as to the legality of subpoenas issued by all these bodies are resolved in the courts. By omitting only grand juries in § 2518, Congress indicated that it was dealing with the forum in which the testimony was sought to be adduced, and that the suppression hearing authorized by the section was not to be available to grand jury witnesses.

In the light of these conflicting implications from the statutory language itself, resort to the legislative history is appropriate. Passages from the legislative history cited by the Court in its opinion do not focus at all on the availability of a suppression hearing in grand jury proceedings; they simply speak in general terms of the congressional intent to prohibit and penalize unlawful electronic surveillance, of which intent there can, of course, be no doubt. But several parts of the legislative history address themselves, far more particularly than any relied upon by the Court in its opinion, to the actual issue before us. The Senate Report, for example,

indicates as plainly as possible that the exclusion of grand juries from the language of § 2518 (10)(a) was deliberate:

> "This provision [§ 2518 (10)(a)] must be read in connection with sections 2515 and 2517, discussed above, *which it limits.* It provides the remedy for the right created by section 2515. Because no person is a party as such to a grand jury proceeding, the provision does not envision the making of a motion to suppress in the context of such a proceeding itself. Normally, there is no limitation on the character of evidence that may be presented to a grand jury, which is enforcible by an individual. [*United States* v. *Blue,* 384 U. S. 251 (1966).] There is no intent to change this general rule. It is the intent of the provision only that when a motion to suppress is granted in another context, its scope may include use in a future grand jury proceeding." S. Rep. No. 1097, 90th Cong., 2d Sess., 106 (1968). (Emphasis added.)

There is an intimation in the opinion of the Court that the reason this language was used may have been that grand juries do not pass upon motions to suppress, while courts do. This intimation is not only inconsistent with the language of the section itself, as pointed out, *supra,* at 80, but it attributes to the drafters of the report a lower level of understanding of the subject matter with which they were dealing than I believe is justified. It is also rather squarely contradicted by the statement that there is no limitation on the character of evidence that may be presented to a grand jury "which is enforcible by an individual." Had the report meant to stress the presumably well-known fact that grand juries do not themselves grant motions to suppress, it would not have

used that language, nor would it have cited *United States* v. *Blue,* 384 U. S. 251 (1966).

The fact that the report states the reason for the policy adopted in terms of the rights of an "individual," rather than in terms of the rights of a "defendant," makes the Court's discussion of the doctrine of various cases, *ante,* at 60, of doubtful help in construing the statute. Whatever *United States* v. *Blue, supra,* may be said to "hold" after careful analysis by this Court, the drafters of the Senate Report undoubtedly took it to stand for the proposition for which they cited it. As stated by Mr. Justice Frankfurter, concurring in *Green* v. *United States,* 356 U. S. 165, 189:

> "The fact that scholarship has shown that historical assumptions regarding the procedure for punishment of contempt of court were ill-founded, hardly wipes out a century and a half of the legislative and judicial history of federal law based on such assumptions."

Not only does the report dealing with § 2518 (10)(a) make clear that it is to be construed in connection with § 2515, which it limits, but the section of the same report dealing with § 2515 re-emphasizes this conclusion. Speaking of the latter section, the report says:

> "The provision must, of course, be read in light of section 2518 (10)(a) discussed below, which defines the class entitled to make a motion to suppress. It largely reflects existing law. . . . Nor generally [is there any intention] to press the scope of the suppression rule beyond present search and seizure law. See *Walder* v. *United States,* 347 U. S. 62 (1954). . . . The provision thus forms an integral part of the system of limitations designed to protect privacy. Along with the criminal and

civil remedies, it should serve to guarantee that the standards of the new chapter will sharply curtail the unlawful interception of wire and oral communications." S. Rep. No. 1097, 90th Cong., 2d Sess., 96 (1968).

The conclusion that § 2518 (10)(a) is the exclusive source of the right to move to suppress is further fortified by the Senate Report's comment on § 2510 (11) of the Act, which defines an "aggrieved person" as one who is a party to an "intercepted wire or oral communication or a person against whom the interception was directed." The Senate Report, p. 91, states:

"This definition defines the class of those who are entitled to invoke the suppression sanction of section 2515 discussed below, *through the motion to suppress provided for by section 2518 (10)(a), also discussed below.* It is intended to reflect existing law . . . ." (Citations omitted.) (Emphasis added.)

Finally, § 2518 (9) requires the Government to provide to each party to "any trial, hearing or other proceeding" a copy of the court order authorizing surveillance if the Government intends to use the fruits thereof. The Senate Report, p. 105, states:

" 'Proceeding' is intended to include all adversary type hearings. . . . It would not include a grand jury hearing. Compare [*United States* v. *Blue, supra*]."

If § 2515 of the Omnibus Crime Control and Safe Streets Act of 1968 stood alone without any informative legislative history, the Court's conclusion with respect to the rights of these petitioners would be plainly correct. If the conflicting implications from two sections of the same statute were present in a regulatory scheme which was to stand by itself, rather than to be superimposed on procedures such as contempt hearings and

institutions such as the grand jury, the Court's conclusion would at least be tenable. But when the Court concludes that Congress, almost in a fit of absentmindedness, has drastically enlarged the right of potential grand jury witnesses to avoid testifying, and when such a conclusion is based upon one of two ambiguous implications from the language of the statute, and is contrary to virtually every whit of legislative history addressed to the point in issue, I think its conclusion is plainly wrong.

## IV

The Court seeks to bolster its reasoning by reliance upon 18 U. S. C. § 3504 (a)(1), which was a part of the Organized Crime Control Act of 1970. That section provides in pertinent part as follows:

"(a) In any . . . proceeding . . . before any . . . grand jury . . .

"(1) upon a claim by a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act or because it was obtained by the exploitation of an unlawful act, the opponent of the claim shall affirm or deny the occurrence of the alleged unlawful act."

Assuming, *arguendo,* that this section does apply to petitioners in No. 71–110, the record in the District Court and the opinion of the Court of Appeals clearly show that only Gelbard made what might be called a "claim" within the language of the section, and that the Government in its response did "affirm or deny" the occurrence of the alleged unlawful act; in fact, the Government denied the occurrence of the unlawful act. This should be sufficient for disposition of the case as to these petitioners.

The Court, without giving much guidance to those who would seek to follow the path by which it reaches the conclusion, concludes that this section "confirms that

Congress meant that grand jury witnesses might defend contempt charges by invoking the prohibition of § 2515 against the compelled disclosure of evidence obtained in violation of Title III." If the Court means to say any more than that, under the circumstances specified in § 3504, the Government must affirm or deny, I am at a loss how it extracts additional requirements from the language used by Congress in that section.

But even if the Court were correct in deciding that § 3504 (a)(1) requires more than it says of the Government, I believe the Court errs in deciding that this section applies at all to these petitioners. Title VII as enacted actually consists of two parts, A and B. Part A is a series of findings by Congress, reading as follows:

"The Congress finds that claims that evidence offered in proceedings was obtained by the exploitation of unlawful acts, and is therefore inadmissible in evidence, (1) often cannot reliably be determined when such claims concern evidence of events occurring years after the allegedly unlawful act, and (2) when the allegedly unlawful act has occurred more than five years prior to the event in question, there is virtually no likelihood that the evidence offered to prove the event has been obtained by the exploitation of that allegedly unlawful act." § 701, 84 Stat. 935.

The House Report (to accompany S. 30) contains this comment on Part A:

"This section contains a special finding relating, *as do the following sections of the title,* to certain evidentiary problems created by electronic surveillance conducted by the Government *prior to the enactment of Public Law 90–351 on June 19, 1968,* which provided statutory authority for obtaining surveillance warrants in certain types of criminal

investigations." H. R. Rep. No. 91–1549, p. 50 (1970). (Emphasis supplied.)

The same report, in its introductory discussion of Title VII, contains the following statement:

"Title VII intends to limit disclosure of information illegally obtained by the Government to defendants who seek to challenge the admissibility of evidence because it is either the primary or indirect production [*sic*] of such an illegal act. The title also prohibits any challenge to the admissibility of evidence based on its being the fruit of an unlawful governmental act, if such act occurred 5 years or more before the event sought to be proved. As amended by the committee, the application of title VII is *limited* to Federal judicial and administrative proceedings, and *to electronic or mechanical surveillance which occurred prior to June 19, 1968,* the date of enactment of the Federal wiretapping and electronic surveillance law (chapter 119, title 18, United States Code)." *Id.*, at 34. (Emphasis supplied.)

The Senate Report, too, casts § 3504 (a)(1) in quite a different light from that in which the Court puts it:

"Lastly, it should be noted that nothing in section 3504 (a)(1) is intended to codify or change present law defining illegal conduct or prescribing requirements for standing to object to such conduct or to use of evidence given under an immunity grant. See, *e. g., Giordano* v. *United States,* 394 U. S. 310 (1969); *Alderman* v. *United States,* 394 U. S. 165 (1969). *Nevertheless, since it requires a pending claim as a predicate to disclosure, it sets aside the present wasteful practice of the Department of Justice in searching files without a motion from a de-*

*fendant. . . ."* S. Rep. No. 91–617, p. 154 (1969). (Emphasis supplied.)

These conclusions in the Senate Report are supported by statements of the bill's managers in the House during the time it was being debated. Congressman Poff explained Title VII as follows:

"Title VII of S. 30 . . . would, first, reverse the Supreme Court's decision in *Alderman* v. *United States,* 394 U. S. 165 (1969) requiring, under its supervisory power, the disclosure of Government files in criminal trials, and . . . would, second, set a 5-year 'statute of limitations' on inserting issues dealing with the 'fruit of the poisonous tree' in similar cases." 116 Cong. Rec. 35192.

Congressman Celler explained the amendments incorporating the pre-June 19, 1968, time limitation into subsections (a)(2) and (a)(3) of § 3504 that had been made by a subcommittee of the House Judiciary Committee in these words:

"As amended by the committee, the application of title VII is limited to Federal judicial and administrative proceedings, and to electronic or mechanical surveillance which occurred prior to June 19, 1968, the date of enactment of the Federal wiretapping and electronic surveillance law—chapter 119, title XVIII, United States Code." *Id.,* at 35196.

Even more specific was the explanation of the amendment made by Congressman Poff on the floor of the House after the time provisions had been included:

"TITLE VII — LITIGATION CONCERNING SOURCES OF EVIDENCE
"Mr. Chairman, title VII of the Organized Crime Control Act is designed to regulate motions to suppress evidence in certain limited situations where

the motion is based upon unlawful electronic eavesdropping or wiretapping *which occurred prior to the enactment of the Federal electronic surveillance laws on June 19, 1968* . . . .

. . . . .

"Where there was in fact an unlawful overhearing prior to June 19, 1968, the title provides for an in camera examination of the Government's transcripts and records to determine whether they may be relevant to the claim of inadmissibility. . . . To the extent that the court is permitted to determine relevancy in an ex parte proceeding, the title will modify the procedure established by the Supreme Court in *Alderman* v. *United States* [citation omitted]. . . .

"*As I have indicated, the title applies only to disclosures where the electronic surveillance occurred prior to June 19, 1968.* It is not necessary that it apply to disclosure *where an electronic surveillance occurred after that date,* because *such disclosure will be mandated, not by Alderman, but by section 2518 of title 18,* United States Code, added by title III of the Omnibus Crime Control and Safe Streets Act of 1968. Section 2518 (10) [(a)] provides a specific procedure for motions to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom, on the grounds that the communication was unlawfully intercepted, that the authorization for the interception was insufficient, or that the interception was not made in conformity with the authorization obtained. It provides, insofar as the disclosure of intercepted communications is concerned, that upon the filing of a motion to suppress by an aggrieved person the trial judge may in his discretion make available to such person and his counsel for inspec-

tion such portions of an intercepted communication, or evidence derived therefrom, as the judge determines to be in the interest of justice—see Senate Report No. 1097, 90th Congress, 2d Session 106, 1968. *The provisions of this title will, therefore control the disclosure of transcripts of electronic surveillances conducted prior to June 19, 1968. Thereafter, existing statutory law, not Alderman, will control.* Consequently, *in view of these amendments to* title VII, its enactment, in conjunction with *the provisions of title III of the 1968 act, provides the Federal Government with a comprehensive and integrated set of procedural rules governing suppression litigation concerning electronic surveillance." Id.,* at 35293–35294. (Emphasis added.)

The weight of the findings actually enacted by Congress in Part A and the uniform tenor of the legislative history outweigh, in my opinion, the ambiguity arising from the failure to actually include a cutoff date in § 3504 (a)(1).

Section 3504 (a)(1) by its terms, even if read totally out of its context and background, as the Court seeks to do, affords these petitioners no help because the Government has complied with its requirements in these cases. But more importantly, the entire thrust of the findings actually adopted by Congress, and of the reports of both Houses, makes it as plain as humanly possible that this section was intended as a *limitation* on existing rights of criminal defendants, not as an *enlargement* of them. Congress, displeased with the effect of this Court's decision in *Alderman, supra,* desired to put a statute of limitations type cutoff beyond which the Government would not be required to go in time in order to disprove taint. Equally displeased with the policy adopted by the Government of searching its files for evidence of taint even when none had been alleged

by the defendant, it sought to put a stop to that practice by requiring the Government to "affirm or deny" only where there is "a claim by a party aggrieved that evidence is inadmissible." Understanding of this background not only affords a complete explanation of the language used by Congress in this section, but illustrates the palpable error into which the Court has fallen in construing it. The Court has at least figuratively stood on its head both the language and the legislative history of this section in order to conclude that it was intended to expand the rights of criminal defendants.

## V

Neither the Omnibus Crime Control and Safe Streets Act of 1968 nor the Organized Crime Control Act of 1970, when construed in accordance with the canons of statutory construction traditionally followed by this Court, supports the expansive and novel claims asserted by these petitioners. The Court having reached a contrary conclusion, I respectfully dissent.