The **STATE OF MICHIGAN**, Plaintiff,

v.

Edwin **MEESE**, Attorney General for the United States, Defendant,

and

Steve **Asmar** and Metro Institutional Food Services, Inc., Intervening Defendants.

Civ. No. 87–CV–70865–DT.

United States District Court, E.D. Michigan, S.D.

Aug. 10, 1987.

As Amended Aug. 11, 1987.

---

Timothy Baughman, Chief Crim. Div., Detroit, Mich., for plaintiff.

Lori Fields, Dept. of Justice, Civ. Div., Washington, D.C., for defendant Edwin Meese.

## AMENDED OPINION AND ORDER *

COHN, District Judge.

### I.

This is an action for a declaratory judgment. 28 U.S.C. § 2201; Fed.R.Civ.P. 57. Plaintiff, the State of Michigan, seeks a declaration that Title III of the Omnibus Crime Control Act and Safe Streets Act of 1968 ("the Act"), 18 U.S.C. §§ 2510–2520,[1] violates the Tenth Amendment of the United States Constitution[2] as applied to the states. Section 2515 of Title 18 prohibits, *inter alia*, a state or political subdivision from introducing as evidence in any proceeding the contents, or fruits thereof, of a communication intercepted in violation of section 2511.

Plaintiff argues that the only conceivable justification for the Act is the Commerce Clause of the Constitution. Art. 1, § 8, cl. 3. Plaintiff recognizes that the United States Supreme Court has affirmed the wide scope of the Commerce Clause even as applied to the states, but relies on language in *Garcia v. San Antonio Metropol-*

*itan Transit Authority*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), that can be construed as having left open the possibility that the Tenth Amendment might impose some "affirmative limits ... on federal action affecting the States under the Commerce Clause." *Id.* at 556, 105 S.Ct. at 1020–21. Plaintiff contends that the Act exceeds such affirmative limits.

The complaint mainly addresses legal questions, not facts. Its statement of the facts of the underlying "controversy" is limited to the following:

> Plaintiff is in receipt of a recording of telephone conversations containing evidence of public corruption. The recording was delivered anonymously, and recorded by a person or persons unknown. 18 USC 2511 and 2515 are preventing investigation of these apparent acts of public corruption.

The "recording" is an audio cassette tape recording that has been the subject of considerable dispute in civil matters on the Court's docket. *Jo-Dan, Ltd., Inc. v. Detroit Board of Education*, No. 86–CV–72565–DT; *A & M Corp. v. Landmark Shoppe, Inc.*, No. 86–CV–72738–DT; *Asmar v. Detroit News, Inc.*, No. 86–CV–73390.

Plaintiff did not allege that a prosecution is advancing in which a state prosecutor

---

* This Amended Opinion And Order is entered to correct an inaccurate statement in footnote 3 in the Opinion And Order of July 24, 1987.

1. The case focuses on section 2515, which provides in full:

   Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be receivd in evidence in any trial, hearing, or other proceeding in or before any court, grand jury ... of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.

   Section 2511 provides in pertinent part:

   (1) Except as otherwise specifically provided in this chapter any person who—

   (a) willfully intercepts, endeavors to intercept, or procures any other person to intercept or endeavoer to intercept, any wire or oral communication;

   .  .  .  .  .

   (c) willfully discloses, or endeavors to disclose, to any other person the contents of any

wire or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire or oral communication in violation of this subsection; or

   (d) willfully uses, or endeavors to use, the contents of any wire or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire or oral communication in violation of this subsection;

   shall be fined not more than $10,000 or imprisoned not more than five years, or both. Pub.L. 90–351, Title III, § 802, June 19, 1968, 82 Stat. 216. The Electronic Communications Privacy Act of 1986, Pub.L. 99–508 (effective January 20, 1987), comprehensively revised Title III but preserved section 2515 without amendment.

2. "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

will attempt to introduce as evidence the recording or evidence derived therefore. The complaint did allege that the United States Supreme Court had previously declined to assert original jurisdiction over the matter.[3]

Concerned that the case was not "ripe" for judicial consideration, the Court issued an Order to Show Cause on March 13, 1987, giving both parties an opportunity to comment on whether a "case or controversy" exists, as required by Art. III, § 2, cl. 1 of the Constitution. The Order noted that plaintiff appeared to be seeking "an advisory decree upon a hypothetical state of facts." *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 325, 56 S.Ct. 466, 473, 80 L.Ed. 688 (1936), cited in Advisory Committee Notes to Rule 57, *supra*. The Order also noted that a federal court will not declare on the constitutionality of aspects of an investigation in progress. *See Hastings v. Judicial Conference of the United States*, 770 F.2d 1093, 1100–03 (D.C.Cir.1985). Finally, the Order stated that it does not appear that "all parties having an interest [in the declaration sought] or adversely affected [have been] made parties or be[en] cited." Advisory Notes, *supra*.

Plaintiff's response to the Order to Show Cause revealed that the Wayne County Citizens Grand Jury issued subpoenas in an investigation related to matters disclosed on the tape recording of various telephone conversations, including officials of the Detroit Board of Education, intercepted in probable violation of 18 U.S.C. § 2515. Following a motion in Wayne County Circuit Court to quash the subpoenas based on the Act, a Wayne County circuit judge supervising the grand jury quashed the subpoenas on June 18, 1986, citing the Act as the basis for his decision. Plaintiff filed the state court order quashing the subpoenas and a transcript of the extensive hearing on the motion. Plaintiff argued that the state judge's action created a "case or controversy" because it deprived the State of the only means of investigating the matters discussed in the conversations on the tape.

Defendant filed a response to the Order to Show Cause on April 13, 1987. Defendant, who is joined in the case because he is "charged with the responsibility of enforcing the laws of the United States,"[4] agreed with plaintiff that the matter is ripe for judicial consideration. Defendant asserted that purely legal questions are involved and unlikely to be clarified by further factual development. *See Thomas v. Union Carbide Agricultural Productions Co.*, 473 U.S. 568, 581, 105 S.Ct. 3325, 3333, 87 L.Ed.2d 409 (1985); *Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 300–01, 99 S.Ct. 2301, 2309–10, 60 L.Ed.2d 895 (1979).

For the reasons stated on the record of the hearing on May 4, 1987, the Order to Show Cause was dismissed by Order of May 5. On May 22, the intervening defendants—one of whom admits involvement in the intercepted conversations—moved to intervene either as of right, Fed.R.Civ.P. 24(a)(2), or by permission, Fed.R.Civ.P. 24(b)(2). The motion was granted on June 2.

Now before the Court are cross-motions for summary judgment. Fed.R.Civ.P. 56. There are no disputes over facts, as the case presents a purely legal question. The parties have ably briefed the issue, and the Court has conducted its own analysis beyond the scope of the briefs.

For the reasons that follow, defendant's motion is GRANTED and the case is DISMISSED.

---

**3.** Plaintiff apparently sought to invoke the Supreme Court's original, but not exclusive, jurisdiction over controversies between the United States and a State. *See* 28 U.S.C. § 1251(b)(2). The complaint states that the Supreme Court declined leave to plaintiff to file a bill of complaint in this matter and that the Solicitor General opposed plaintiff's application on the ground that the federal district is a more appropriate original forum. The Supreme Court's one sentence order expressed no opinion as to the appropriate forum in this matter. *State of Michigan v. Meese*, —— U.S. ——, 107 S.Ct. 1274, 94 L.Ed.2d 135 (1987).

**4.** The Attorney General is a proper party to any action affecting the interests of the United States. *See* 28 U.S.C. §§ 516, 517, 2403(a); *see also* Fed.R.Civ.P. 24(c).

## II.

### A.

This case clearly poses a question about the limits of the principle of federalism and its embodiment in the Bill of Rights, the Tenth Amendment. Much has been said of late about federalism and the role of the judiciary. *Compare, e.g., The Status of Federalism in America* (Report of the Working Group on Federalism of the Domestic Policy Council, Nov., 1986) (bemoaning the failure of the Supreme Court to overrule more Congressional statutes), *and* Van Alstyne, *The Second Death of Federalism*, 83 Mich.L.Rev. 1709 (1985) (criticizing *Garcia, supra* ), *with* J. Choper, *Judicial Review and the National Political Process: A Functional Reconsideration of the Role of the Supreme Court* (1980) (proposing that the Supreme Court rule such federalism issues to be nonjusticiable questions that must be left to the political branches).

At least two state courts have noted that section 2515 involves questions of federalism when applied to state court proceedings that are traditionally of state concern. *Compare In re Marriage of Lopp*, 268 Ind. 690, 378 N.E.2d 414, 421 (1978) (refusing to apply section 2515 under circumstances of case), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1023, 59 L.Ed.2d 76 (1979), *with Halpin v. Superior Court of San Bernardino County*, 6 Cal.3d 885, 101 Cal.Rptr. 375, 495 P.2d 1295, 1305 (rejecting Tenth Amendment challenge to section 2515), *cert. denied*, 409 U.S. 982, 93 S.Ct. 318, 34 L.Ed.2d 246 (1972). One constitutional scholar has noted that, in general, the "[e]xpansion of federal criminal jurisdiction raises some of the most sensitive problems of potential congressional impingement upon the values of federalism." G. Gunther, *Constitutional Law Cases and Materials* 194 (9th ed. 1978).

### B.

However divergent may be the political, academic, and state court views regarding federalism, the Court is bound to look for guidance in the decisions of the Supreme Court of the United States. The issue is not decided in a legal vacuum. The Supreme Court has considered the scope of the Tenth Amendment, even though its teachings on that subject may be in a state of flux. Briefly, however, this much can be said: there is not a single case that can be considered "good law" that purports to overrule a federal statute on the ground that it violates the Tenth Amendment.

In *Usery v. National League of Cities*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), the Supreme Court struck down a federal minimum wage statute for state employees as violative of the Tenth Amendment. After *Usery*, however, the Supreme Court declined to invalidate a single federal law applicable to the states on the ground that it interferes with their autonomy under the Tenth Amendment. Now, even *Usery* is no longer the law. With the Supreme Court's decision in *Garcia, supra*, which overruled *Usery*, the Tenth Amendment has become a dead letter in constitutional law.

Subsequent to *Garcia*, it is not clear what standard applies to issues like the one before the Court. *Garcia* seems to have discarded *Usery* 's "balancing" test. *See* 469 U.S. at 564 n. 7, 105 S.Ct. at 1025 n. 7 (Powell, J., dissenting). *But see id.* at 579– 80, 105 S.Ct. at 1032–33 (Rehnquist, J., dissenting) (disagreeing that *Usery* announced a "balancing" test). However, *Garcia* fails to "identify or define what affirmative limits the constitutional structure might impose on federal action affecting the States under the Commerce Clause." *Id.* at 556, 105 S.Ct. at 1020–21. Indeed, the State of Michigan admits that "it is difficult to conceive a method of analysis for the question here at issue." While the State has attempted to fill this void with some imaginative legal and political analysis, it does not lead to the declaration it seeks.

### C.

The Supreme Court is unlikely to accept the State's argument here, since the Supreme Court has applied the exclusionary rule—a judicial supervisory rule not re-

quired by the Constitution, *see United States v. Leon,* 468 U.S. 897, 905–06, 104 S.Ct. 3405, 3411–12, 82 L.Ed.2d 677 (1984) —to the States, with the same result as here of suppressing evidence the State seeks to introduce in a prosecution. Under the exclusionary rule, states are bound to exclude evidence in some cases even where governmental agents obtained the evidence in subjective good faith (as, for example, where an officer's seizure of the evidence under a facially deficient warrant is not objectively reasonable). *Leon,* 468 U.S. at 922–23, 104 S.Ct. at 3420–21. The Supreme Court has already noted that, as the exclusionary rule was understood at the time, section 2515 proscribes such evidence not only to deter misconduct by governmental agents but also to preserve the integrity of court proceedings, *i.e.,* "to ensure that the courts do not become partners to illegal conduct." *Gelbard v. U.S.,* 408 U.S. 41, 49–51 & n. 8, 92 S.Ct. 2357, 2362 & n. 8, 33 L.Ed.2d 179 (1972) (quoting the Congressional findings that precede Title III, § 801(b), 82 Stat. 211). Thus, the State's argument here that its agents did nothing reprehensible in obtaining the recording at issue is not relevant.

Another persuasive example against the State's position is the Supreme Court's requirement that state courts exclude confessions obtained in violation of the familiar *Miranda* warning (or an adequate state equivalent). Here, the Supreme Court has imposed on state criminal proceedings a judicially-designed rule of evidence not required by the Constitution. *See Michigan v. Tucker,* 417 U.S. 433, 444, 94 S.Ct. 2357, 2363–64, 41 L.Ed.2d 182 (1974). The result is to exclude in some cases evidence voluntarily given and constitutionally obtained. *See Michigan v. Mosely,* 423 U.S. 96, 100, 96 S.Ct. 321, 324–25, 46 L.Ed.2d 313 (1975); *Tucker, supra,* 417 U.S. at 443, 94 S.Ct. at 2363.

By enacting section 2515, Congress requires exclusion of illegally obtained electronic recordings, which is a form of obtaining an incriminating statement without informed consent or proper safeguards against intrusion of privacy. The State does not say why, if it is legitimate for the Supreme Court to promote the integrity of the courts through rules of criminal procedure, Congress may not do the same. In *Olmstead v. United States,* 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1927), the Supreme Court endorsed the power of Congress to make intercepted telephone conversations inadmissible whereas the courts might lack such power under the Fourth Amendment (as understood at that time). *Id.* at 465–66, 48 S.Ct. at 568–69. Indeed, the legislative history of section 2515 indicates that Congress largely intended to reflect existing search and seizure law. *See* S.Rep. No. 1097, 90th Cong., 2d Sess. 66, 96, *reprinted in* 1968 U.S.Code Cong. & Admin.News 2112, 2185.

The State concedes that Congress may forbid private persons from intercepting conversations without authorization, but simply argues that the State may subsequently use evidence privately intercepted even if its own agents could not have legally made the initial seizure. While the Supreme Court has accepted this argument where Congress has not spoken, *see United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984), the Supreme Court has disallowed state use of such evidence where Congress has spoken, as in section 605 of the Communications Act of 1934, the predecessor of section 2515. *See Lee v. Florida,* 392 U.S. 378, 88 S.Ct. 2096, 20 L.Ed.2d 1166 (1968).[5] The State correctly points out that the Supreme Court in *Lee* did not address the Tenth Amendment issue. Nonetheless, the Supreme Court's subsequent pronouncements on the Tenth Amendment and continued application of the exclusionary rule to state courts sug-

---

**5.** The Court in *Lee* stated: "We conclude … that nothing short of mandatory exclusion of the illegal evidence will compel respect for the federal law 'in the only effectively available way—by removing the incentive to disregard it.' *Elkins v. United States,* 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960)." 392 U.S. at 386–87, 88 S.Ct. at 2101–02. The Court of Appeals for the First Circuit recently reached the same conclusion under the current section 2515. *United States v. Vest,* 813 F.2d 477 (1st Cir.1987).

gest it would not overrule *Lee* or the statutory basis for that decision.

In enacting section 2515, Congress noted: "Only by striking at all aspects of the problem can privacy be adequately protected." S.Rep. No. 1097, *supra*, at 69 (quoted in *Gelbard, supra,* 408 U.S. at 50, 92 S.Ct. at 2362), *reprinted in* 1968 U.S.Code Cong. & Admin.News 2156. In making this statement, Congress indicated that it considers judicial exclusion of improperly obtained communications "necessary and proper" to execute its other intentions in Title III. *See* S.Rep. No. 1097, *supra*, at 96, *reprinted in* 1968 U.S.Code Cong. & Admin.News 2185 (asserting power found at Art. 1, § 8, cl. 18). As noted above, these other intentions include judicial integrity, which, as also noted earlier, was dispositive in the Supreme Court's decision in *Lee* to uphold the predecessor statute to section 2515. In short, Congress agrees with the Supreme Court that a bright-line rule of exclusion is best suited to protect the federal interests at stake. Such bright-line rules are always best addressed in the political arena rather than in the courts, since they evolve against the background of law developed on an *ad hoc* basis by the courts. See Professor Herbert Wechsler's seminal work on this subject, *The Political Safeguards of Federalism: The Role of the States in the Composition and Selection of the National Government*, 54 Colum.L. Rev. 543, 545 (1954).

Where, as here, the State concedes Congress's power (absent consideration of the Tenth Amendment) to enact such a law, the Tenth Amendment does not impose an independent limitation on Congress that permits a court to reject Congress's view that a narrow aspect of a statute is "necessary" to effectively implement its larger purposes.[6] As stated by Justice Story: "It is plain, therefore, that it could not have been the intention of the framers of this [Tenth] amendment to give it effect, as an abridgement of any of the powers granted under the constitution, whether they are express or implied, direct or incidental." 3 *Commentaries on the Constitution* § 1901 (1833), *in* V *The Founders' Constitution* 406 (P. Kurland & R. Lerner ed. 1987).

There is nothing peculiar about Congress's intrusion under the Commerce Clause into state criminal proceedings that compels a different conclusion. Admittedly, there is little discussion by the Founding Fathers of the meaning of the Tenth Amendment as it relates to criminal laws and their administration. This is to be expected, since it was presumed that all powers in such matters not given to the United States would continue, unenumerated, within the states as before. However, there is a pertinent reference by President James Monroe on this subject: "[T]he administration of justice, and the whole criminal code, *except in cases of breaches of the laws of the United States made under and in conformity with the powers vested*

**6.** Professor Van Alstyne has noted the Supreme Court's general refusal to substitute its view of what is "necessary" for that of Congress when federalism concerns are involved. "Usually, ... even in close cases when the federalism claim has failed (as most often it has indeed failed), it has failed because the Court has yielded to an assertion of some overriding federal interest it deemed adequate to rationalize the exceptional intrusiveness of the challenged act." *The Second Death of Federalism, supra,* 83 Mich.L.Rev. at 1722 & n. 61. *See Fry v. United States,* 421 U.S. 542, 548, 95 S.Ct. 1792, 1796, 44 L.Ed.2d 363 (1975) (upholding application of federal wage restraints as a national emergency measure); *Testa v. Katt,* 330 U.S. 386, 67 S.Ct. 810, 91 L.Ed. 967 (1947) (upholding binding nature of penal provisions of Emergency Price Control Act on state courts under supremacy clause); *Case v. Bowles,* 327 U.S. 92, 66 S.Ct. 438, 90 L.Ed. 552 (1946) (upholding application of the Emergency Price Control Act against Tenth Amendment challenge).

While not explicitly considering the Tenth Amendment issue, the Court has several times struck state judicial procedural rules in order to further a federal legislative goal or protect a federal statutory right. *See International Longshoreman's Ass'n, AFL-CIO v. Davis,* 476 U.S. 380, 106 S.Ct. 1904, 90 L.Ed.2d 389 (1986) (striking state pleading rule to protect preemption of National Labor Relations Act); *Dice v. Akron, Canton & Youngstown R.R.,* 342 U.S. 359, 72 S.Ct. 312, 96 L.Ed. 398 (1952) (striking state procedural rule to protect right of recovery under Federal Employers' Liability Act); *Brown v. Western Ry. of Alabama,* 338 U.S. 294, 70 S.Ct. 105, 94 L.Ed. 100 (1949) (same); *see also Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (imposing federal interpretation of "harmless error rule" over that of state).

*in Congress ... are regulated by State laws." The Founders' Constitution, supra,* at 405, *reprinting in part Views of the President of the United States on the Subject of Internal Improvements* (May 4, 1822) (emphasis added). This statement evidences that one of the few Founding Fathers [7] who may have said anything on the subject did not consider the Tenth Amendment to establish any special limitation on Congress simply becuase it may choose to exercise its vested power in the criminal arena.

Currently, constitutional doctrine regarding the Tenth Amendment has reverted to its pre-*Usery* state, to wit, the Tenth Amendment is no more than a truism; it tautologically states that powers not given to the federal government are reserved to the states. The Court recognizes the avowed intent of Chief Justice Rehnquist in his *Garcia* dissent to resurrect *Usery.* 469 U.S. at 580, 105 S.Ct. at 1033. Perhaps a majority of the Supreme Court will do so as its composition changes and shifts in its politics and philosophy of constitutional adjudication.

As noted by Professor Herbert Wechsler, "Federalism would have few adherents were it not, like other elements of government, a means and not an end." *The Political Safeguards of Federalism, supra,* at 552. A return to *Usery* would likely be

considered to "politicize" the Constitution, which the defendant has cautioned against elsewhere.[8] The long-standing view, however, has been that the Tenth Amendment will not support political goals:

> The attempts, then, which have been made from time to time, to force upon this language [the Tenth Amendment] an abridging, or restrictive influence, are utterly unfounded in any just rules of interpreting the words, or the sense of the instrument. Stripped of the ingenious disguises, in which they are clothed, they are neither more nor less, than attempts to foist into the text the word "expressly;" to qualify, what is general, and obscure, what is clear, and defined. They make the sense of the passage bend to the wishes and prejudices of the interpreter; and employ criticism to support a theory, and not to guide it.... [Constitutions] are not to be frittered away to please the demagogues of the day. They are not to be violated to gratify the ambition of political leaders.

Story, *Commentaries, supra,* § 1901, *in* V *The Founders' Constitution, supra,* at 407.

### III.

Even if the *Garcia* dictum on which the State relies makes the Tenth Amendment

---

**7.** While some may disagree with the characterization of Monroe as a "Founding Father," he participated substantially in the formation of the Republic, including the debates about the principle of federalism, and was familiar with the thinking of the greater men who overshadowed him during that era. Monroe studied law under Thomas Jefferson beginning in 1780. From 1783 to 1786 he served in the Congress under the Articles of Confederation. He was chosen a member of the Virginia House of Delegates in 1787 and, in 1788, a member of the state convention at which Virginia ratified the new federal Constitution.

**8.** *See* Remarks of the Attorney General at the American Studies Center Bicentennial Program in Washington, D.C. (June 12, 1987). The printed version of the Attorney General's address states, at 2: "Too often the Constitution has been, in a word, politicized. The modern-day politicization of our supreme law has been encouraged primarily by political and judicial liberals...." Commentators have noted, however,

that *Usery* was a conservative political doctrine. A leading treatise on constitutional law describes the rise of *Usery* as follows: "There is little or no explanation for the shift in the Court's position regarding the judicially enforceable nature of the tenth amendment other than the political background and philosophy of the newly appointed justices. The decisions of the 1970's, attacking the established principle of judicial deference to congressional decisions regarding federalism issues were joined only by Republican justices. Those justices were Blackmun, Powell, Rehnquist, Stewart (who was replaced by the even more states' rights oriented Justice O'Connor) and Chief Justice Burger." J. Nowak, R. Rotunda & J. Young, *Constitutional Law* 162 n. 33 (3d ed. 1986). Ultimately, the doctrinal "glue" holding together the *Usery* approach proved so weak that it could not hold even a majority of a conservative Court, as reflected in the change of mind by Justice Blackmun, who concurred in *Usery* but wrote the opinion of the Court in *Garcia* only nine years later.

fertile soil for planting the seeds of a states' rights movement, it would ill behoove a federal district judge to say so by declaring unconstitutional an act of Congress in so important an area as here. Much has been said of late regarding the evils of activist judges who strain to overrule legislation enacted by the elected representatives of the people. If those elected to serve in Washington should desire to constrain the actions of their governments back home, far be it from this Court to tell them that they cannot do so. *See Garcia,* 469 U.S. at 556, 105 S.Ct. at 1020–21. *See generally The Political Safeguards of Federalism, supra.*

If the Constitution forbids the Act, it is for someone else to say.

SO ORDERED.