2012 CO 18

**Thomas Lynn O'HARA, III, Petitioner**

v.

**The PEOPLE of the State of Colorado, Respondent.**

**No. 10SC386.**

Supreme Court of Colorado,
En Banc.

March 5, 2012.

Davide C. Migliaccio, Colorado Springs, Colorado, Attorney for Petitioner.

John W. Suthers, Attorney General, Katherine A. Hansen, Senior Assistant Attorney General, Denver, Colorado, Attorneys for Respondent.

Justice MÁRQUEZ delivered the Opinion of the Court.

¶ 1 In this case, we interpret Colorado's wiretapping statute, which permits a judge to issue an ex parte order approving a wiretap only "upon application of the attorney general or a district attorney." § 16–15–102(1)(a), C.R.S. (2006). Defendant–Petitioner, Thomas Lynn O'Hara, III, was convicted of distribution of a schedule II controlled substance, adjudicated a habitual criminal, and sentenced to ninety-six years in the Department of Corrections. Prior to trial, O'Hara moved unsuccessfully to suppress the State's wiretap evidence against him, contending, among other things, that the wiretaps were not properly authorized because the elected district attorney had not personally prepared or signed the applications to initiate or extend the wiretaps.

¶ 2 On appeal, O'Hara renewed his challenge to the wiretap evidence. The court of appeals held that section 16–15–102(1)(a) requires the attorney general or a district attorney to "specifically authorize a specific wiretap application," but the elected official "need not sign or personally submit the application." *People v. O'Hara,* 240 P.3d 283, 285 (Colo.App.2010). Because the court of appeals concluded that the record contained no finding by the trial court that the elected district attorney specifically authorized the

wiretaps, it remanded the case for further proceedings. *Id.* at 284, 291.

¶ 3 We granted O'Hara's petition for writ of certiorari to review the court of appeals' interpretation of section 16–15–102 and the propriety of its remand order.[1] We agree in substance with the court of appeals' statutory interpretation and we affirm the court of appeals' decision to remand for further proceedings.

¶ 4 We hold that section 16–15–102(1)(a) requires the attorney general or an elected district attorney to personally authorize an application to initiate or extend a wiretap, but does not require the elected official to personally prepare or submit the application. Personal authorization of the application by a senior, publicly accountable elected official plays a central role in the statutory scheme and provides a necessary safeguard against unlawful government intrusion into the privacy of citizens through the extraordinary investigative device of electronic surveillance. Thus, an application that lacks the requisite personal authorization of the elected official renders a court's approval of the wiretap or extension invalid, and the interception of communications pursuant to that court approval "unlawful" under section 16–15–102(10).

¶ 5 The elected official's personal authorization can be established, by his or her signature on the application. An application to initiate or extend a wiretap containing the signature of the elected official is presumed to be properly authorized; an aggrieved person seeking to rebut such a presumption must introduce some evidence sufficient to make a threshold showing that the signature was inauthentic or that someone else author-

---

1. We granted certiorari review on the following three issues:

   1. Whether the court of appeals erroneously held that the elected district attorney need not personally apply for a wiretap, but need only give actual authorization, contrary to the requirements of both state and federal statutes, and the holding of this court in *People v. Milnes,* 186 Colo. 409, 527 P.2d 1163, 1167 (Colo.1974).

   2. Whether the court of appeals further improperly modified this court's requirement that the district attorney personally apply for any extensions, by holding that because ap-

plications for extensions of the original wiretap order incorporated the initial application, and were submitted pursuant to the same procedures as the initial application, the extensions stand or fall with the lawfulness of the original order.

   3. Whether the court of appeals erred in reversing the opinion below, on rehearing, based on an argument which was never raised, either at the trial court level or on appeal, before the petition for rehearing, and based on extra-record factual representations by the attorney general.

ized the application. While the lack of the elected official's signature on the application is not fatal, in the absence of the elected official's signature, the requisite personal authorization cannot be presumed. Under such circumstances, the prosecution must show compliance with section 16–15–102(1)(a) by establishing that the application was personally authorized by the attorney general or elected district attorney. This compliance may be shown through the sworn testimony or affidavit of the elected official, or similar proof.

¶ 6 We agree with the court of appeals that the record in this case does not presently support a finding that the elected district attorney personally authorized each of the applications and extension requests at issue. We also affirm the court of appeals' decision to remand this case for further proceedings, albeit on different grounds. We conclude that a remand to the trial court is appropriate in this case given that neither the parties nor the trial court had the benefit of our interpretation today of section 16–15–102(1)(a). Accordingly, we remand this case to the court of appeals with directions to remand to the trial court for further proceedings consistent with this opinion.

## I. Background

¶ 7 In 2006, while investigating a major methamphetamine ring in Grand Junction, a task force officer with the Drug Enforcement Administration Western Colorado Drug Task Force, submitted a wiretap application ("initial application") to a district judge (Judge Bottger), seeking approval for wiretaps on two cell phones allegedly used by the drug ring. The initial application was signed and sworn only by the task force officer but stated, "[a]pplication for this order is being submitted by Peter G. Hautzinger District Attorney for the Twenty First Judicial District, State of Colorado, his appointed Deputy District Attorney, Daniel P. Rubenstein, and I." The district judge approved both wiretaps for thirty days. Thereafter, the task force officer applied for wiretaps on additional phones associated with the drug ring, and also applied for thirty-day extensions of the wiretaps. The district judge approved each

of these additional wiretaps and the thirty-day extensions. The subsequent applications in the record before us were signed and sworn only by the task force officer. These subsequent applications did not contain the language stating that the application was "being submitted by" the elected district attorney or the deputy district attorney; rather, they simply incorporated the initial application by reference.

¶ 8 Based on evidence gathered from the wiretaps, the People charged O'Hara with distribution of a schedule II controlled substance, in violation of section 18–18–405(1), (2)(a)(I)(B), C.R.S. (2006). Prior to trial, O'Hara moved to suppress the evidence against him obtained and derived from the wiretaps, arguing that the wiretaps were unlawful because the district attorney had not personally compiled or signed the applications to initiate and extend the wiretaps, in violation of section 16–15–102(1)(a).

¶ 9 In response, the People argued that Colorado law does not require someone from the district attorney's office to sign a wiretap application if the district attorney's office has actually authorized the application. The People observed that the task force officer's application identified Pete Hautzinger, District Attorney for the 21st Judicial District, and Dan Rubenstein, Chief Deputy District Attorney, as the authorizing attorneys. The People asserted that Hautzinger and Rubenstein "did, in fact, authorize the wiretap." The People also noted that the initial application stated that it was being "submitted by" District Attorney Hautzinger and Chief Deputy District Attorney Rubenstein. The People further argued that under Colorado law, the deputy district attorney could authorize the applications himself in any event, without express authorization from the elected district attorney. Notably, the People asserted that Chief Deputy District Attorney Rubenstein, the lead prosecutor in the case, "read and personally approved all applications and extensions thereof" and that "Judge Bottger was aware that [Rubenstein] was the person who was authorizing the documents."

¶ 10 The trial court (Judge Colt) held a hearing on O'Hara's motion to suppress. At that hearing, the task force officer testified

regarding the authorization of the initial application:

Q. [By Chief Deputy District Attorney Rubenstein] To the best of your knowledge, when you signed and swore [the statement in the initial application that it was being "submitted by" the district attorney] under oath, was that information accurate?

A. Absolutely.

Q. Were there things that occurred after that that would corroborate to you in your mind that it was, in fact, with the knowledge and authorization of Pete Hautzinger, the District Attorney?

A. Yes, there was.

Q. Can you explain those to the Court?

A. Yes. First of all, like I mentioned earlier, you had told me that you had spoken with him and he had authorized the staffing levels for your office to assist us in this investigation. Also, I spent numerous hours in your office at the District Attorney's Office where Pete Hautzinger would come in, in person and talk to you and I in person about the investigation and how it was going and what was going on within the investigation.

Q. Was it evident from those discussions that he was fully aware ... of what we were doing?

A. Yes.

¶ 11 Later in the hearing, when a second prosecutor on the case sought to call Rubenstein as a witness, O'Hara's counsel objected on the grounds that Rubenstein could not, under the Colorado Rules of Professional Conduct, act as both an advocate and a witness, and would have to be disqualified from the case. This objection prompted Rubenstein's co-counsel to make the following offer of proof:

[W]ithin his office, [Rubenstein] is responsible for handling cases such as this one that involve wiretaps. He is familiar with the process. He would testify to that process and how both he and his superior, the elected District Attorney—he would be able to testify to the process that they use in determining whether to go forward on a wiretap and effectively establishing the au-

thorization issue that [defense counsel] has raised on Mr. O'Hara's behalf.

[Rubenstein] would specifically testify to what happened in this particular case in that regard. I would anticipate that his testimony would be similar and corroborative of what the Court heard earlier from the agent involved, as they were both present; but in particular, he would be able to testify personally since he is the individual involved with making authorization decisions about how that occurred.

¶ 12 After some argument over whether the Rubenstein ethically could take the stand to testify, the trial court stated:

I think I'm satisfied just from the testimony I've already heard and looking at [the initial application]. Just as you argue, that's a specific statement that this witness has sworn to before a judicial officer. Then today, she's testified under oath not only to that statement but also that the District Attorney was part of this whole investigation from the get-go. So I'm not going to require testimony. That will obviate one issue in the case.

¶ 13 After the hearing, the trial court issued a written order denying O'Hara's suppression motion. The court stated that it "found the testimony of [the task force officer] that the elected district attorney was involved with the investigation and application for the wiretap to be credible" and that the task force officer's testimony was corroborated by the language in the initial application indicating it was "submitted by" the elected district attorney. The court concluded that, "[i]t appears to this Court that the Mesa County District Attorney's Office was heavily involved with the wiretap investigation from the beginning through its completion and further that Judge Bottger followed the requirements of [section 16–15–102]." The trial court, however, never expressly found that the district attorney had personally authorized any of the wiretap applications and it rejected O'Hara's contention that the district attorney had to personally apply for the extensions.

¶ 14 O'Hara was convicted at trial of distributing methamphetamine and sentenced to ninety-six years in the Department of Cor-

rections. On appeal, O'Hara argued, among other things, that the trial court erred in denying his suppression motion. The court of appeals held that "section 16–15–102 requires that the attorney general or a district attorney specifically authorize a specific wiretap application, but that the elected official need not sign or personally submit the application." *People v. O'Hara*, 240 P.3d 283, 285 (Colo.App.2010). The court of appeals concluded that in this case "there [was] no finding by the trial court that the district attorney specifically authorized the wiretap application and nothing in the record would support such a finding in any event." *Id.* "Rather, both the testimony at the suppression hearing and the court's order reflect that the district attorney was aware of and involved in the investigation, nothing more." *Id.* at 290. The court of appeals further observed that, "[b]ecause the applications for extensions of the original wiretap order incorporated the initial application and were submitted pursuant to the same procedures as the initial application, the extensions of the wiretap stand or fall with the lawfulness of the original wiretap order." *Id.* (citing *United States v. Giordano*, 416 U.S. 505, 532–33, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974)). The court of appeals initially reversed O'Hara's convictions and remanded for a new trial without the suppressed evidence. Upon rehearing, however, the court of appeals instead remanded the case for a hearing and further findings. *Id.* at 291. The court reasoned:

> It appears from the record that the People were prepared to present evidence that the wiretap application was authorized by the elected district attorney but rested in any further attempt to present supporting evidence, in part, because of the trial court's order. Under these circumstances, we remand for a hearing regarding the application's authorization and for further findings regarding the same.

*Id.* at 290–91.

¶ 15 We granted certiorari review and now affirm the court of appeals' decision to remand, albeit on different grounds.

## II. Standard of Review

¶ 16 The court of appeals' ruling was based on its interpretation of section 16–15–102. We review that interpretation de novo, and our primary task in doing so "is to give effect to the General Assembly's intent." *Bostelman v. People*, 162 P.3d 686, 689 (Colo. 2007). "When interpreting the general assembly's intent, we turn first to the language of the statute.... [W]here the language is ambiguous we rely on other factors such as legislative history, the consequences of a given construction, and the end to be achieved by the statute." *Klinger v. Adams Cnty. Sch. Dist. No. 50*, 130 P.3d 1027, 1031 (Colo. 2006). "The requirements of section 16–15–102 are to be interpreted in a practical and commonsense fashion to effectuate their purpose." *People v. Ingram*, 684 P.2d 243, 246 (Colo.1984).

## III. Analysis

¶ 17 O'Hara argues that the wiretap and extension applications in his case are fatally defective because the elected district attorney did not personally apply for them. He further objects to the court of appeals' order remanding the case for further findings and argues that his convictions instead should be reversed and the case remanded for a new trial.

### A. Relevant federal and state wiretapping provisions

¶ 18 The government's use of electronic surveillance to listen to and record private communications constitutes a "search and seizure" within the meaning of the Fourth Amendment. *See Katz v. United States*, 389 U.S. 347, 353, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In passing Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), Pub. L. No. 90–351, 82 Stat. 212 (codified as amended at 18 U.S.C. §§ 2510–2522 (2006)), Congress established a "comprehensive scheme for the regulation of wiretapping and electronic surveillance." *Gelbard v. United States*, 408 U.S. 41, 46, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972). The procedures of Title III were designed to protect the general public from abuse of that government power. *United*

*States v. King,* 478 F.2d 494, 505 (9th Cir. 1973). Accordingly, Title III authorizes law enforcement interception of private wire and oral communications, but only to investigate specified serious crimes, and only with judicial approval given upon the government's compliance with stringent conditions. *See Gelbard,* 408 U.S. at 46, 92 S.Ct. 2357.

¶ 19 Section 2516 of Title III " 'authorizes the interception of particular wire or oral communication under court order pursuant to the authorization of the appropriate, Federal, State, or local prosecuting officer.' " *United States v. Giordano,* 416 U.S. 505, 520, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974) (quoting S.Rep. No. 90–1097, at 69 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2185). This provision was designed to centralize law enforcement policy regarding the use of electronic surveillance in a senior official who is accountable to the public and subject to the political process. *See* S.Rep. No. 90–1097, at 69–70; *see also* Giordano, 416 U.S. at 520, 94 S.Ct. 1820 (observing that the Senate report recognizes that the authority to apply for court orders under Title III is narrowly confined and limited to those responsive to the political process).

¶ 20 Section 2516(2) provides that "[t]he principal prosecuting attorney of any State, or the principal prosecuting attorney of any political subdivision thereof" "may apply" to a state court judge for a wiretap if authorized by state statute to do so. 18 U.S.C. § 2516(2).

¶ 21 Pursuant to the authority granted by section 2516(2), Colorado enacted the provision now codified at section 16–15–102(1)(a). At the time the wiretap applications were submitted in this case, section 16–15–102(1)(a) provided that:

> [a]n ex parte order authorizing or approving the interception of any wire, oral, or electronic communication may be issued by any judge of competent jurisdiction of the state of Colorado *upon application of the attorney general or a district attorney,*

showing by affidavit that there is probable cause to believe that evidence will be obtained of the commission of any one of the crimes enumerated [herein] or that one of [those] enumerated crimes will be committed. . . .

§ 16–15–102(1)(a), C.R.S. (2006) (emphasis added).[2]

¶ 22 With this context in mind, we turn to our analysis of Colorado's requirements for wiretap applications in section 16–15–102(1)(a).

## B. Section 16–15–102 requires the elected official to personally authorize an application for a wiretap order.

¶ 23 O'Hara argues the phrase "upon application of . . . a district attorney" in section 16–15–102(1)(a) means that the elected district attorney must personally apply for a wiretap.

### 1. "District attorney"

¶ 24 As a preliminary matter, we agree with O'Hara that the reference to "a district attorney" in section 16–15–102(1)(a) means the elected district attorney of a judicial district, not an assistant district attorney or deputy district attorney. In Colorado, the office of the "district attorney" is established by the state constitution, and the General Assembly has the exclusive authority to prescribe the duties of that office. Colo. Const. art. VI, § 13; § 20–1–107(1), C.R.S. (2011). As an elected official, a district attorney, like the attorney general, is politically accountable to the public. By statute, the elected district attorney in each judicial district may appoint subordinates, including "deputy district attorneys," section 20–1–201(1), C.R.S. (2011), a "chief deputy district attorney," section 20–1–201(2), and an "assistant district attorney," section 20–1–205(1)(a), C.R.S. (2011). However, these statutorily authorized appointees are distinct from, and subordinate to, the elected "district attorney" as that office is understood and used in Colora-

---

**2.** In 2008, the General Assembly amended this section to add, "or his or her designee if the attorney general or district attorney is absent from his or her jurisdiction" after the language emphasized in the text quoted above. Ch.22,

sec. 1, § 16–15–102(1)(a), 2008 Colo. Sess. Laws 47 (effective August 6, 2008). We construe the provision as it existed in 2006 when the wiretap applications in O'Hara's case were submitted.

do law. By referring specifically and only to "district attorney" in section 16–15–102(1)(a), we conclude that the General Assembly meant the elected district attorney.[3]

¶ 25 Our interpretation of "district attorney" is confirmed by the legislature's 2008 amendments to section 16–15–102(1)(a). That provision now reads: "upon application of the attorney general or district attorney, *or his or her designee if the attorney general or district attorney is absent from his or her jurisdiction.*" Ch. 22, sec. 1, § 16–15–102(1)(a), 2008 Colo. Sess. Laws 47, 47 (emphasis added). As part of the same amending legislation, the General Assembly also added subsection 16–15–102(1)(c):

For the purposes of [section 16–15–102(1)(a) ]:

(I) The district attorney shall designate the assistant district attorney or the chief deputy district attorney; and

(II) The attorney general shall designate either the chief deputy district attorney general or the deputy attorney general of the criminal section of the office of attorney general.

Ch. 22, sec. 1, § 16–15–102(1)(c), 2008 Colo. Sess. Laws 47, 47. Given the legislature's addition of these references to specific subordinate appointees as designees of the elected official, the original language "the attorney general or a district attorney" logically can only have referred to the actual elected official.

### 2. "Upon application"

■ ¶ 26 We next consider what the phrase "upon application" means for purposes of section 16–15–102(1)(a). As we recently observed in *People v. Gallegos,* 251 P.3d 1056, 1067 (Colo.2011), "[w]e have assumed that the district attorney must personally initiate the wiretap and must personally apply for any extension of the duration of the wiretap." We cited our decision in *People v. Milnes* as the basis for that as-

sumption. *Id.* (citing *People v. Milnes,* 186 Colo. 409, 417, 527 P.2d 1163, 1167 (1974)). However, neither of our holdings in those cases required us to construe what is meant by "upon application of the attorney general or district attorney" for purposes of section 16–15–102(1)(a).

¶ 27 *Milnes* interpreted an earlier version of Colorado's wiretap statute. 186 Colo. at 412, 527 P.2d at 1164. The earlier statute likewise provided that an ex parte order could issue "upon application of the attorney general or a district attorney";[4] however, the issue in *Milnes* was whether an application for the *subsequent use of evidence* derived from the wiretap must be signed personally by the district attorney. 186 Colo. at 416, 527 P.2d at 1166. We concluded that the provision for supplemental use, section 39–24–2(15), did not require the district attorney's personal involvement. *Milnes,* 186 Colo. at 416, 527 P.2d at 1166–67. In so holding, we noted that the supplemental use provision omitted such a requirement, in contrast to the provisions governing applications to initiate or extend a wiretap. *Id.* However, our comparison to, and description of, those other provisions was not part of the holding in *Milnes.*

¶ 28 *Gallegos* likewise did "not raise the question of whether there was a violation of the personal application requirement of the wiretap statute." 251 P.3d at 1067. There, the dispute concerned *when* the application was signed by the district attorney. *Id.* Thus, neither *Milnes* nor *Gallegos* is dispositive of what is meant by "upon application of the attorney general or a district attorney" in section 16–15–102(1)(a).

¶ 29 We examine the phrase "upon application" in light of the federal wiretapping law, from which state authority to intercept communications is derived. 18 U.S.C. § 2516(1) identifies the federal officials who may authorize an application for a wiretap. By stating in section 2516(2) that the "[t]he prin-

---

**3.** Our interpretation comports with the federal wiretapping law, which allows states to authorize "[t]he principal prosecuting attorney of [the] State" or "the principal prosecuting attorney of any political subdivision" of the state to apply for a wiretap. 18 U.S.C. § 2516(2).

**4.** *Compare* ch. 45, sec. 1, § 39–24–2(1)(a), 1972 Colo. Sess. Laws 269, 269, with § 16–15–102(1)(a), C.R.S. (2011).

cipal prosecuting attorney of any State, or the principal prosecuting attorney of any political subdivision thereof" "may apply" to a state court for a wiretap order, Congress intended to allow the designated state official likewise to authorize an application.

¶ 30 Federal circuit courts have noted that the Senate report on Title III indicates that the language "may apply" in section 2615(2) is equivalent to "authorize." *United States v. Smith,* 726 F.2d 852, 858 (1st Cir.1984); *United States v. Tortorello,* 480 F.2d 764, 777 n. 9 (2d Cir.1973). The Senate report explains:

> Paragraph (2) provides that the principal prosecuting attorney of any State or the principal prosecuting attorney of any political subdivision of a State *may authorize an application* to a State judge of competent jurisdiction, ... for an order authorizing the interception of wire or oral communications.

S.Rep. No. 90–1097, at 70 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2187 (emphasis added).

¶ 31 Colorado's wiretap statute "is closely patterned after and designed to implement the policies of the federal act. Federal authorities explaining the federal act should thus be accorded great weight in interpreting the Colorado statute." *People v. Wahl,* 716 P.2d 123, 128 (Colo.1986). We conclude that the General Assembly's use of the phrase "upon application" in section 16–15–102(1)(a) is patterned on the similar phrasing "may apply" that appears in 18 U.S.C. § 2516(2). In light of the Senate report equating "may apply" with "may authorize an application" for purposes of the federal legislation, we likewise construe "upon application" in section 16–15–102(1)(a) to mean "upon authorization" by the attorney general or a district attorney. We therefore conclude that section 16–15–102(1)(a) requires the attorney general or district attorney to authorize an application to initiate or extend a wiretap but does not require the elected official to "apply" for a wiretap order by personally compiling or submitting the application.

¶ 32 Our interpretation of section 16–15–102(1)(a) is supported by other provisions of section 16–15–102 indicating that the official need only authorize the application. *See, e.g.,* § 16–15–102(2)(a) (providing that each wiretap application must identify "the officer *authorizing* the application") (emphasis added); § 16–15–102(5)(d) (requiring the judicial order approving the wiretap to specifically identify the "person *authorizing* the application") (emphasis added); § 16–15–102(17)(a)(I)(A), (II)(A) (exempting the wiretap application from certain requirements if "the application is made by an investigative or law enforcement officer and *is approved by* the attorney general or the district attorney of the district in which the application is sought") (emphasis added).

¶ 33 Various courts have concluded that so long as the designated official actually authorizes the application for the wiretap, he or she need not personally make the application. *See, e.g., Little v. State,* 157 Ga.App. 462, 278 S.E.2d 17, 19 (1981); *Commonwealth v. Vitello,* 367 Mass. 224, 327 N.E.2d 819, 837–39 (1975); *State v. Monsrud,* 337 N.W.2d 652, 655–56 (Minn.1983). As the Second Circuit explained, the important objectives of centralization and accountability "can be effectively attained by having the chief prosecuting officer pass on applications which his assistants prepare and, after he has approved them, having them presented to the issuing judge. That objective will not be furthered by requiring the chief prosecuting officer to appear personally before the issuing judge." *Tortorello,* 480 F.2d at 777; *accord United States v. Ceraso,* 467 F.2d 647, 652 (3d Cir. 1972) (reasoning that once the appropriate official personally approves the wiretap application, "the purposes of centralization are achieved").

¶ 34 Therefore, we conclude, as did the court of appeals in this case, that so long as the attorney general or a district attorney personally authorizes each wiretap application, section 16–15–102(1)(a) does not require the official to personally prepare or submit the wiretap application.

**C. The statutory requirement of personal authorization applies to an application to extend a wiretap order.**

■ ¶ 35 Construing section 16–15–102 as a whole, we also hold that the attorney gen-

eral or an elected district attorney must personally authorize applications to extend a wiretap.

¶ 36 Colorado's wiretap law requires the same procedural safeguards for extension orders as it does for initial wiretap orders. Section 16–15–102(6) provides that "[a]n extension of an order may be granted but only *upon application for an extension* made in accordance with [section 16–15–102(2) ] and the court making the findings required by [section 16–15–102(4) ]." (Emphasis added.) An "application" for an extension, like an "application" to initiate a wiretap, must contain the information required by section 16–15–102(2).[5] For example, an application to initiate or to extend a wiretap must "be made in writing upon oath or affirmation," and must state "the applicant's authority to make such application" and "[t]he identity of ... the officer authorizing the application." § 16–15–102(2), (6). In addition, an application to initiate or to extend a wiretap must, among other things, contain "a complete statement of the facts and circumstances relied upon by the applicant," including details about the subject offense and the particular type of communication sought to be intercepted, and a statement as to whether other investigative procedures have been tried and failed, or why they are unlikely to succeed or are too dangerous.[6] § 16–15–102(2), (6). Moreover, before issuing an order with respect to any application to initiate or to extend a wiretap, a judge must first determine, among other things, that there is probable cause to believe the target is committing, has committed, or is about to commit an offense enumerated in the statute; whether there is probable cause to believe that particular communications concerning the offense will be intercepted; and that normal investigative techniques have been tried and have failed, or are un-

likely to succeed or are too dangerous. § 16–15–102(4), (6). Finally, no order (including an extension order) entered under section 16–15–102 may authorize the interception of communications for any period longer than necessary to achieve the objective of the authorization, or in any event longer than thirty days. § 16–15–102(6).

¶ 37 The existence of these parallel requirements is an acknowledgment that an extension of a wiretap is another intrusion of privacy, equally serious as the initial wiretap. Logically then, an "application" for an extension must, as a threshold matter, be authorized by the attorney general or a district attorney, in accordance with section 16–15–102(1). Under subsection (1), an ex parte order authorizing or approving the interception of "*any* wire, oral, or electronic communication" may issue only "upon application of the attorney general or a district attorney." § 16–15–102(1)(a) (emphasis added). As discussed above, that subsection requires personal authorization by the appropriate elected official. Moreover, subsection (1) also restricts the use of wiretapping to the investigation of specific felony-level offenses. *See* § 16–15–102(1)(a)(I)–(IX) (listing offenses); § 16–15–102(1)(b) (providing that a wiretap order may issue only for a crime listed in subsection (1) for which a felony penalty is authorized upon conviction). To construe the important threshold limitations on government intrusion found in subsection (1) *not* to apply to extension applications would vitiate these important safeguards. Thus, we conclude that an "application" for an extension required by section 16–15–102(6) must, like an "application" to initiate a wiretap, be authorized by the attorney general or a district attorney as required by section 16–15–102(1)(a).[7] *See United States v. Bynum*, 513

5. Section 16–15–102(2) sets forth the required contents of an application to initiate or extend a wiretap. This provision is closely patterned on the federal requirements set forth in 18 U.S.C. § 2518.

6. An application for an extension must, in addition, include a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain those results. § 16–15–102(2)(f).

7. To the extent that the court of appeals concluded otherwise by stating that "the extensions of the wiretap stand or fall with the lawfulness of the original wiretap order," we disagree. *People v. O'Hara*, 240 P.3d 283, 290 (Colo.App. 2010). Certainly, if an order approving the initiation of a wiretap was invalid because the application was not personally authorized by the proper official, then any extension of that wiretap is likewise invalid because an extension order necessarily relies on evidence obtained under the initial wiretap order. *See* § 16–15–

F.2d 533, 535 & n. 2 (2d Cir.1975) (agreeing that federal wiretapping law contemplates an authorization procedure for extensions similar to that required for initial applications); see also 1 James G. Carr, *The Law of Electronic Surveillance* § 4:10 (2010) (citing *Bynum*, 513 F.2d at 535).

### D. Personal authorization by the elected official may be established by the official's signature on the application or similar proof.

#### 1. Motions to suppress wiretap evidence

■ ¶ 38 Colorado's wiretapping statute permits an aggrieved person to move to suppress the content of any intercepted wire, oral, or electronic communication or the evidence derived therefrom if the communication is: (1) unlawfully intercepted; (2) the order of authorization or approval is insufficient on its face; or (3) the interception was not made in conformity with the order of authorization or approval. § 16–15–102(10); *People v. Gallegos*, 251 P.3d 1056, 1066 (Colo. 2011).

■ ¶ 39 Although communications may be "unlawfully intercepted" based on constitutional or statutory violations, not every failure to comply with the statute renders the interception unlawful or requires suppression. *Gallegos*, 251 P.3d at 1066. The test is whether the procedure allegedly violated concerns a statutory requirement that " 'directly and substantially implement[s] the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device.' " *Id.* (quoting *United States v. Giordano*, 416 U.S. 505, 527, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974)).

¶ 40 The personal authorization of the elected official is such a requirement, and thus, where a wiretap application has not been personally authorized by the attorney general or a district attorney, the content of any intercepted communications and any evidence derived therefrom must be suppressed. *See Giordano*, 416 U.S. at 528, 94 S.Ct. 1820 ("We are confident that the provision for pre-application approval was intended to play a central role in the statutory scheme and that suppression must follow when it is shown that this statutory requirement has been ignored."); *United States v. King*, 478 F.2d 494, 505 (9th Cir.1973) ("The authorization requirements . . . are not mere technicalities; they are at the heart of the congressional scheme.").

#### 2. Establishing personal authorization of the appropriate official

■ ¶ 41 Personal authorization may be established by the signature of the appropriate official on the application. Some courts have suggested that this is the better practice. *United States v. Smith*, 726 F.2d 852, 859 (1st Cir.1987) (noting the "preferred practice" in Massachusetts of "the district attorney cosigning every application" and observing that, "[a]s a matter of common sense it seems to us to impose no real extra burden on a district attorney to affix his signature to an application that he has already considered in detail."); *People v. Lewis*, 84 Ill.App.3d 556, 40 Ill.Dec. 310, 406 N.E.2d 11, 14 (1980) (noting that "written authorization may be the preferred procedure, if only to forestall litigation of whether or not there was actual authorization"); *Commonwealth v. Vitello*, 367 Mass. 224, 327 N.E.2d 819, 826 (1975) ("[T]he better procedure is that the Attorney General or district attorney should cosign the application. . . .").

■ ¶ 42 An application that is signed by the attorney general or district attorney enjoys a presumption that it was properly and personally authorized by that official. *United States v. Turner*, 528 F.2d 143, 151 (9th Cir.1975) ("[I]t is to be presumed that the officer has properly exercised the judgment called for by the statute when he affixes his signature to an order authorizing an application.").

102(2)(f); *United States v. Giordano*, 416 U.S. 505, 530–33, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). However, the converse is not true: an initial wiretap order based on a properly author-

ized application does not automatically render valid all extensions of that order, because each extension application requires separate authorization by the appropriate official.

¶ 43 Moreover, the prosecution need not separately authenticate a signature, at least where no serious allegation is raised regarding its authenticity. *United States v. de la Fuente*, 548 F.2d 528, 534 (5th Cir. 1997). To rebut the presumption of personal authorization that attaches to an application signed by the elected official, a defendant must allege specific facts and introduce evidence tending to show that the signature was inauthentic or indicating that someone else had authorized the application. *Id.* at 536 (holding that the prosecution did not need to authenticate the signature of the attorney general on the authorizing memorandum attached to the wiretap application where the defendants did not "allege or prove any facts tending to indicate some government impropriety"); *see also Gallegos*, 251 P.3d at 1067 ("[w]hen a defendant has introduced no evidence tending to show that the authorizing signature is inauthentic or that someone other than an authorized person approved the application ... the evidence should not be suppressed" for improper authorization).

¶ 44 An application that lacks the elected official's signature is not entitled to a presumption that the application was personally authorized. However, the absence of a signature is not fatal, and can be remedied by other proof of actual authority. *Smith*, 726 F.2d at 859. Thus, where the challenged wiretap application lacks the signature of the authorizing official, the prosecution must show compliance with section 16–15–102 by establishing that the application was personally authorized by the attorney general or elected district attorney. This compliance may be established through the sworn testimony or affidavit of the elected official, or similar proof. Numerous courts have relied on such evidence to find that the appropriate official did, in fact, authorize a wiretap application. *See, e.g., United States v. Chavez*, 416 U.S. 562, 565, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974) (noting that the attorney general filed an affidavit stating that he had personally approved the specific wiretap application); *United States v. Ceraso*, 467 F.2d 647, 650–52 (3d Cir.1972) (same); *People v. Lewis*, 84 Ill.App.3d 556, 40 Ill.Dec. 310, 406 N.E.2d 11, 14 (1980) (observing that the undisputed testimony of the State's Attorney revealed that he had authorized the specific wiretap application); *State v. Hunt*, 781 P.2d 473, 476 (Utah Ct.App.1989) (stating that the county attorney "submitted an affidavit attesting to the fact that he approved the applications").

## IV. Application to O'Hara's Case

¶ 45 We agree with the court of appeals that the record contains no finding by the trial court that the elected district attorney personally authorized each application to initiate and extend the wiretaps.

¶ 46 The trial court denied O'Hara's motion to suppress after concluding that "the Mesa County District Attorney's Office was heavily involved with the wiretap investigation from the beginning through its completion and further that [the judge who issued the wiretap order] followed the requirements of [section 16–15–102]." The court "found the testimony of [the task force officer] that the elected district attorney was involved with the investigation and application for the wiretap to be credible," and also pointed to the initial application, which stated that the application was being submitted by the elected district attorney, a deputy district attorney, and the task force officer.

¶ 47 The trial court's conclusion that the district attorney's office was heavily involved with the wiretap investigation does not amount to a finding that the elected district attorney personally authorized each application to initiate or extend a wiretap. Nor would the present record support such a finding. The statement in the initial application that the application was being "submitted by" the district attorney was no more than an assertion, by someone other than the district attorney, that the district attorney was "submitting" the application. Even assuming this statement complies with section 16–15–102(2)(a) (requiring the application to identify "the officer authorizing the application"), such compliance does not, without more, establish the actual personal authorization required by section 16–15–102(1)(a). The People's response to O'Hara's motion to suppress, asserting that the district attorney and deputy district attorney "did, in fact, authorize the wiretap," is an unsworn state-

ment in a brief. The task force officer's belief that the district attorney had authorized the applications was not sufficient proof of actual authorization. Likewise, the offer of proof that Chief Deputy District Attorney Rubenstein would testify to the process he and the elected district attorney use "in determining whether to go forward on a wiretap" is not sufficient proof of District Attorney Hautzinger's personal authorization.

¶ 48 O'Hara argues that the court of appeals erred when it altered its initial opinion following rehearing and remanded the case rather than reverse O'Hara's convictions. He contends that the remand was improperly based on the People's argument, raised for the first time in their petition for rehearing, that any insufficiency in the record of evidence of actual authorization was attributable to the trial court's decision to limit the People's presentation of evidence; and was improperly based on the People's assertion on rehearing that appellate counsel was advised that the district attorney did, in fact, specifically authorize the original wiretap and extension applications. We need not address O'Hara's contentions because we independently conclude that a remand for further findings and conclusions by the trial court is appropriate in this case given that neither the parties nor the trial court had the benefit of our interpretation of the authorization requirements of section 16–15–102(1)(a). Under the circumstances here, a remand will provide the trial court the opportunity to apply the correct legal standard and to allow the presentation of additional evidence. *Cf. People v. Brazzel,* 18 P.3d 1285, 1289 (Colo. 2001) ("[W]hen the absence of factual findings regarding key contested issues hinders appellate review, or when unresolved evidentiary conflicts exist with regard to material facts, we remand the case to the trial court for further fact-finding.").

¶ 49 On remand, the trial court should determine whether each application to initiate or extend a wiretap was personally authorized by the elected district attorney. If the trial court determines that all the applications to initiate and extend the wiretaps were properly authorized, then the judgment of conviction is affirmed. If the trial court

determines that any one of the applications was not properly authorized, then it follows that any evidence obtained or derived from such an application was "unlawfully intercepted" and should have been suppressed. *See* § 16–15–102(10); *United States v. Giordano,* 416 U.S. 505, 528, 530–33, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). Such an unlawful interception would implicate O'Hara's Fourth Amendment rights. *See Katz v. United States,* 389 U.S. 347, 353, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *People v. Gallegos,* 251 P.3d 1056, 1062 (2011). Accordingly, if on remand the trial court concludes that evidence against O'Hara should have been suppressed, the judgment of conviction is reversed unless the admission of the evidence was harmless beyond a reasonable doubt. *Cf. People v. Madonna,* 651 P.2d 378, 384 (Colo.1982) (holding that erroneous admission of the out-of-court identification violated due process but was harmless beyond a reasonable doubt and thus did not require reversal of the conviction).

## V. Conclusion

¶ 50 For the foregoing reasons, we affirm the court of appeals' decision to remand this case, albeit on different grounds. Accordingly, we remand this matter to the court of appeals with directions to remand to the trial court for further proceedings consistent with this opinion.